# Exhibit 5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

TOPTAL, LLC,

                     Plaintiffs,

    -v-

ANDELA INC. and COURTNEY MACHI,

                     Defendants.

-----------------------------------------------------------------X

Index No. 653677/2021
(Schecter, J.S.C.)

**VERIFIED FIRST AMENDED
COMPLAINT**

*Jury Trial Demanded*

       Plaintiff Toptal, LLC ("Toptal" or "Plaintiff"), for its Verified Complaint, alleges the

following:

## INTRODUCTION

       1.    This is an action for tortious interference with contract, unfair competition,

misappropriation of trade secrets and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836

*et seq.* ("DTSA") against Defendant Andela, Inc. ("Andela"), a recent competitor of Toptal.  As

part of a deliberate scheme to steal from Toptal, led by its CEO Jeremy Johnson, Andela hired and

deployed at least thirty (30) former Toptal personnel,[1] in violation of their confidentiality, non-

solicitation and non-complete agreements with Toptal.  Andela improperly gained access to

Toptal's trade secrets and confidential information, competed unfairly with Toptal, and poached

additional Toptal personnel, clients, and the talent that Toptal matches and sources to clients.

---

[1] These former personnel include (1) Sachin Bhagwata, (2) Martin Chikilian, (3) Alvaro Oliveira, (4) Courtney Machi, (5) Sheryna Goss, (6) Marta McCoy, (7) Leandro Zanella de Souza Campos, (8) Eryn Peters, (9) Patrick Hennessey, (10) Dzenana Preljevic-Sadovic, (11) Carolina Della Corte, (12) Damien Gourvennec, (13) Dusan Balaban, (14) Fernando Anasco, (15) Gordana Netkovska, (16) JC Sanchez Goldar, (17), Jelena Spasovski, (18) Luis Teofilo, (19) Pablo Macias, (20) Paul Pavlovic a/k/a Paul Ole Henn a/k/a Paul Henn, (21) Pedro Nogueira, (22) Ramiro Palacios, (23) Ruben Mercado, (24) Shaman McLean, (25) Tiago Santos, (26) Tomislav Bacinger, (27) Victoria Marafetti, (28) Vilius Popovas, (29) Erica Brunken and (30) Alan Fiddes.  These individuals, together with other former Toptal employees and core team members subsequently hired by Andela, are referred to collectively as the "Former Toptal Personnel at Andela."

2.      This action also asserts claims against Defendant Courtney Machi, the former Senior Product Manager of Toptal and current Vice President of Product at Andela, for flagrantly breaching her confidentiality and non-solicitation obligations to Toptal, including by becoming a point person within Andela for providing Toptal proprietary and confidential information—including *without limitation* through screenshots taken directly from Toptal's non-public, internal website—to solve for dozens of challenges faced by Andela developers.[2]

3.      Toptal – short for "top talent" – is a United States-based company that curates a proprietary talent network of select, highly skilled independent contractors, such as engineers, software developers, designers, finance experts and product managers, and rapidly matches that talent to its clients in the United States and globally. Founded in 2010 by its current CEO Taso Du Val, Toptal is now one of the world's largest fully distributed companies and operates what the company believes is the largest high-skilled, on-demand talent network in the world. Toptal currently serves over 1,000 clients in more than a dozen countries. Through Toptal's meticulously designed proprietary vetting process, developed after substantial time and investment over the past decade, Toptal can meet its clients' needs by matching them promptly and "on demand" with top talent in Toptal's curated global talent network to work remotely on diverse client projects needing just the right set of skills at just the right time. Utilizing these processes, Toptal only admits the top 3% of talent applicants into its proprietary talent network.

4.      Toptal has also made considerable investment in establishing, developing, and promoting the Toptal name and its trademarks through various media, including its web site at https://www.toptal.com/ and through https://www.toptalent.com. As a result of its efforts, Toptal

---

[2] This action previously named certain additional Former Toptal Personnel at Andela, but other than Ms. Machi, the claims against the Former Toptal Personnel were dismissed on May 16, 2022, based on their arbitration agreements or a lack of personal jurisdiction in New York. Dkt. No. 51.

2

has developed substantial goodwill in its brand because clients recognize the quality of Toptal talent and the value of Toptal's proprietary screening and matching services. Likewise, Toptal's talent value the extent to which Toptal's extensive and growing client base allows Toptal's talent to be quickly matched to work on projects that are professionally challenging and rewarding. Toptal is the owner of various federal trademark registrations, including Federal Registration No. 6,025,893 for the mark THE WORLD'S TOP TALENT, ON DEMAND as well as No. 4,944,844 for the name "Toptal."

5.      Andela is a recent competitor of Toptal that is seeking to rapidly replicate Toptal's global remote business model and success. Until mid-2020, Andela operated an outsourcing operation focused on in-person, on-site hubs in Africa. Over the course of the past few years, Andela moved away from its prior focus on in-person hubs situated in Africa and engaged in a barely disguised attempt to become a clone of Toptal.

6.      After having a supposed mere $700 million valuation in 2019, Andela's CEO led a transition of Andela away from its original in-person, on-site strategy to a remote strategy intended to mimic Toptal's business, as a means of attracting new investment capital. After executing on that transition in 2020 and 2021, Andela boasted in various news media in September 2021 that it had raised $200 million in a Series E funding round at a $1.5 billion "unicorn" valuation from investors including SoftBank Vision Fund 2, Whale Rock, Generation Investment Management, the Chan Zuckerberg Initiative and Spark Capital.

7.      However, Andela's supposed doubling its value to attract wealthy investors in under two years was not achieved through its own honest labor and direct research and development, but instead through blatantly ripping off Toptal. According to documents produced by Andela, employees tasked with the "redesign" of Andela were given their mission directly by

3

Andela's CEO and admitted they were given "***direct orders [] to rip off Toptal.***"  The scope and nature of the wholesale misappropriation of Toptal's trade secrets and confidential information was so comprehensive and systematic that Andela personnel internally gloated: "***Toptal is doing the work and spending the money while [Andela] rel[ies] on their time and effort when we bring those engineers here [to Andela].***"

8.      To that end, Andela engaged in a brazen campaign of poaching key Toptal employees and core team members (together, "Toptal Personnel") in order to acquire and then exploit their knowledge and know-how in a knowing and willful interference with the Toptal Personnel's confidentiality and non-solicitation obligations to Toptal.  Andela targeted Toptal Personnel who have worked closely together at Toptal and who individually and collectively have knowledge of Toptal's technology platform, fully-distributed business processes, talent recruitment, screening and matching methods, talent network, client lists, employees, contract workers, and competitive strategy, thereby obtaining an unusually broad view of the confidential inner workings of Toptal in furtherance of Andela's goal of replicating Toptal's proprietary and unique business model.  And Andela did so with complete disregard for, and intent to interfere with, the restrictive covenants to which the Former Toptal Personnel at Andela were bound, recognizing it or the Former Toptal Personnel at Andela would eventually face a lawsuit due to their behavior.  In some instances, the contracts executed with the Former Toptal Personnel at Andela actually specifically referenced their pre-existing obligations to Toptal.

9.      By picking off key executives, senior leaders and other individuals who had worked together at Toptal, Andela has scaled its operations to source and match talent remotely from dozens of countries outside of Africa and to sell Andela's services to Toptal's own clients, including those known to Andela only because of its hiring of former Toptal Personnel.  Prior the

filing of this action, Andela's website passed off Andela as providing the same services as Toptal, inviting potential clients to "[b]uild remote engineering teams with **the world's top talent**", on a landing page displaying a virtually identical layout and color scheme as Toptal's website and prominently designed to piggyback on Toptal's federally registered trademark, "**The world's top talent,** on demand" (emphases supplied).  While some lateral movement between competitors might be expected, Andela's campaign has improper motives and utilizes improper means to expeditiously and expediently recreate Toptal's model using key former Toptal Personnel.  Among Andela's hires of former Toptal Personnel are four individuals who were executives or senior leadership team members at Toptal and who upon jumping to Andela served on its leadership team – Ms. Machi, Sachinkumar Bhaghwata a/k/a Sachin Bhagwata a/k/a Sachin Bhagwat, Martin Chikilian, and Alvaro Oliveira.  These four individuals either led or were top lieutenants in no less than three key functional areas for Toptal.

10.    In addition to former Toptal personnel that Andela hired, Andela and its CEO pumped Toptal's longtime Chief Operating Officer, Mr. Breanden Beneschott, for proprietary Toptal information.  Mr. Johnson also asked Mr. Beneschott to meet with Andela's head of growth capital for generation investment management and Vivian Wu, a managing partner with the Chan Zuckerberg Initiative, a major new investor in Andela, clearly understanding the gravitas that having a former Toptal executive at Andela would bring in attracting new investments from wealthy investors.  In consideration for the valued services that Mr. Beneschott provided with respect to actionable operational information and leads on who to hire from among Toptal's ranks, Mr. Johnson offered to make Mr. Beneschott a member of Andela's board of directors.

11.    Andela actively used the former Toptal Personnel not only to reveal their knowledge of the confidential inner workings and processes at Toptal and its talent and client

networks but also to solicit other Toptal Personnel and to entice and attract individual freelancers from Toptal's meticulously vetted talent network.

    a. Ms. Machi, who is now Vice President of Product at Andela, formerly reported to Toptal's Vice President of Product in her capacity as Director of Product. Andela hired Ms. Machi to tap into her extensive knowledge of Toptal's proprietary software platform and use that know-how to help Andela transform itself from a group of outsourcing hubs situated in various African locations into a fully remote, global company like Toptal. Prior to commencement of this litigation, Toptal caught Ms. Machi soliciting at least one former colleague at Toptal to come work for Andela in direct violation of her non-solicitation agreement with Toptal. Discovery has revealed that she in fact participated in the solicitation of the following former Toptal Personnel at Andela: Sheryna Goss, Carolina Della Corte, Leandro Zanella de Souza Campos, and Eryn Peters, and has actively provided "intelligence" to her Andela colleagues about other key Toptal Personnel to solicit for particular roles at Andela.

    b. Mr. Bhagwata, who left Toptal to serve as Vice President of Enterprise at Andela, was involved in Andela's solicitation of former Toptal Personnel at Andela, including without limitation Mr. Chikilian, Patrick Hennessy, Paul Pavlovic a/k/a Paul Henn a/k/a Pavo Pavolic, and Jelena Ristic to join Andela, but sought to conceal his involvement knowing that it was a violation of his contractual requirements to Toptal. He also utilized his same contact list and the client development methods he learned at Toptal to attract clients for Andela. Toptal has learned that, since leaving Toptal, Mr. Bhagwata has repeatedly reached out to

6

Toptal's point of contact at one of Toptal's largest and most sophisticated "enterprise" clients seeking that client's business for Andela. Discovery has revealed that Mr. Bhagwata appears to have solicited his contacts at various Toptal clients, including, without limitation, Anthem, AXA, Unilever and Walmart, to send business to Andela. Mr. Bhagwata also mass-emailed what appears to be his Toptal client list – even going so far as to copy his own prior Toptal email address – with an invitation to a "VIP Wine Tasting," using virtually the same playbook and name of business development events successfully developed and used by Toptal during Mr. Bhagwata's tenure.

c.   Mr. Chikilian, who helped to run recruitment efforts at Andela as its Head of Talent Operations, previously spent eight years in precisely that role at Toptal, where he gained access to Toptal's highly developed, confidential talent recruitment, vetting and matching processes. On his LinkedIn postings, Mr. Chikilian openly solicited Toptal's freelancers to come join him at Andela and explained to them that he can "fast-track" them into Andela's new global remote talent network: ***"Pro-Tip: if we met each other at some of my past companies, chances are*** that ***you can skip the line to join our network***. DM [direct message] if you believe you should so ***I [can] help you fast-track!"*** (Emphases supplied.) The implication is clear and not even disguised. Mr. Chikilian, who had worked at Toptal from 2011 to September 2019, was openly exploiting his relationships with Toptal's pre-vetted freelancers and his familiarity with Toptal's proprietary process that identifies the top 3% of talent. Furthermore, Toptal has come to learn that Mr. Chikilian periodically contacted one of Toptal's top salespersons, ostensibly under the guise of personal friendship,

7

but presumably with the intent to see if he could recruit his "friend" to leave Toptal and join Andela. Discovery has revealed precisely what Toptal expected: Mr. Chikilian was not only directly soliciting pre-vetted Toptal talent network members to skip the vetting process at Andela (and thus attempting to free-ride on Toptal's proprietary vetting process), but was even involved in Andela's successful solicitation of former Toptal Personnel at Andela, including Mr. Zanella.

d. Mr. Oliveira, who announced to the world via LinkedIn in April 2021 that he had joined Andela as its Executive Vice President of Talent Operations, was Mr. Chikilian's superior at Toptal for nearly eight years and has valuable institutional knowledge of Toptal's trade secrets. Before his public announcement about joining Andela, Mr. Oliveira had worked and consulted for Andela in a behind the scenes capacity since leaving Toptal in 2019, at least as early as the summer of 2020. Mr. Oliveira introduced Tomislav Bacinger and Ms. Peters, both Toptal Personnel, to Andela.

12. Many of the individuals who left Toptal went out of their way to try to mislead Toptal about their post-Toptal plans, being either cagey or careful not to reveal their future plans, only to surface a short while later as an employee or independent contractor at Andela. Their often-identical responses when asked their post-Toptal plans suggests they were coordinated with each other and orchestrated by Andela, which in certain instances explicitly told these individuals not to worry about any contractual commitments they had to Toptal. Each has valuable knowledge of some combination of Toptal's platform, business operations, talent network, and client contacts (among other things). This critical mass of new recruits quickly provided Andela with a team of people who had previously worked together at Toptal and had developed the individual and

8

collective know-how to rapidly scale to a position where Andela can approach prospective talent and clients, including Toptal's existing talent and clients, to offer a 'copycat' version of the services Toptal provides.

13.    Each of the former Toptal Personnel at Andela was subject to confidentiality agreements, some of which have express non-solicitation and non-compete clauses.  Andela was aware of these restrictions and sought to assure the individuals that they need not worry about the ongoing contractual commitments they had to Toptal.  Nevertheless, Andela has unabashedly exploited its new hires' former relationships with Toptal to gain access to Toptal's trade secrets and confidential information – including its methods for vetting top talent, its clients lists, and its methods of managing a fully remote work force and global talent network – and is wrongfully using the information it tactically acquired to unfairly compete with Toptal and poach additional Toptal Personnel, talent, and clients.

14.    In 2020, Andela had conducted interviews with key former Toptal Personnel (including *without limitation* Ms. Machi, Mr. Oliveira, Mr. Bhagwata, Ms. Peters, Mr. Beneschott, Mr. Bacinger, Michael Kearns, and Zach Boyette), and compiled a 28-page document complete with a table of contents entitled "Toptal Info" (hereinafter, the "Toptal Info Compendium").  The Toptal Info Compendium provides a veritable blueprint for how Andela could quickly reproduce Toptal's fully remote, global business model and goes into painstaking detail about Toptal's various functional areas, including Toptal's pricing, technology, bench, sales, finance/accounting, legal, delivery and network community, seemingly based entirely on interviews with these former Toptal Personnel.

15.    After hiring them, Andela routinely sought information from Former Toptal Personnel at Andela about Toptal's internal processes or otherwise exploited their knowledge of

9

Toptal proprietary information.  There are even documents in Andela's possession that appear to be internal Toptal documents (or copied from internal Toptal documents), that appear to have been provided to Andela by former Toptal Personnel.  In fact, Andela personnel openly discussed that individuals at Toptal were "taking documents from Toptal before they yank them off the system" and bringing those documents to Andela.

16.     Ms. Machi, with her extensive knowledge of all of Toptal's product infrastructure, routinely violates her duties of confidentiality to Toptal for Andela's benefit, and has become a point person within Andela for providing Toptal know-how to solve for various challenges faced by Andela product developers.  Discovery revealed that she not only fields queries from Andela's team members and freely discloses information concerning Toptal's portal and other products that she was required to keep secret, but that she also gave formal presentations to Andela about the functionalities of Toptal's talent portal so that Andela could leverage her learnings from Toptal.

17.     From the perspective of Andela's CEO, this broad effort to poach people and confidential and proprietary information from Toptal has provided Andela with the know-how and capabilities to boast to investors that "Andela 2.0" was, in effect, a rapidly assembled 'copycat' version of Toptal.

## PARTIES

18.     Plaintiff Toptal, LLC is a limited liability company organized and existing pursuant to the laws of the State of Delaware, with a principal mailing address at 2810 N. Church St #36879, Wilmington, DE 19802.  Toptal is a fully remote company with no fixed headquarters or executive office.

19.     Defendant Andela, Inc. is a corporation organized and existing pursuant to the laws of the State of Delaware, which is authorized to do business in the State of New York.  During the

10

period relevant to this action, Andela previously had its headquarters in the State of New York at

129 West 29th Street, 4th Floor, New York, NY 10001. Andela now lists its principal executive

office with the New York Department of State as being at 580 Fifth Avenue, Suite 820, New York,

NY 100036.

20.     Upon information and belief, Defendant Courtney Machi is a resident of the State

of Florida, with an address at 5761 Aaron Ct., Sarasota, FL 34232, and is employed by Defendant

Andela through its headquarters in the State of New York.

**JURISDICTION AND VENUE**

21.     This Court has personal jurisdiction over Defendant Andela pursuant to CPLR §

301 because it does business in the State of New York, including some of the transactions, acts

and omissions giving rise to the causes of action asserted herein. Through its counsel, Andela has

appeared in and actively litigated this action in New York.

22.     The Court has personal jurisdiction over Defendant Machi, pursuant to CPLR §

302(a)(1) and (2) because she transacted business or committed some of the tortious acts causing

commercial injury in the State of New York through her employment by Defendant Andela

through its headquarters in the State of New York. Through her counsel, Ms. Machi has appeared

in and actively litigated this action in New York.

23.     Alternatively, the Court has personal jurisdiction over Defendant Machi pursuant

to CPLR § 302(a)(3) because she (1) committed tortious acts outside of New York, (2) the causes

of action herein arose from those acts, (3) the tortious acts caused an injury to Toptal in New York,

where Andela is located and the situs of the commercial injury, (4) she expected or reasonably

should have expected her acts to have consequences in New York, where Andela benefited, and

(5) she derived substantial revenue from interstate or international commerce.

11

24.     This Court is the appropriate venue for this action because Andela maintains an office of its Chief Executive Officer in the State of New York, County of New York, as listed on the website of the New York Department of State.

## FACTS

### I.    Toptal's Business

25.     Toptal is a tech company founded in 2010 by entrepreneur Taso Du Val, its current CEO.  Toptal curates a global talent network that consists of highly-skilled knowledge workers, such as software engineers, developers, product managers, designers, and other freelancers (each, a "Talent").  Toptal matches the select independent contractors in its proprietary talent network, on demand, to its clients who need remote Talent with the right skills to be available at just the right time to assist of a variety of client projects.

26.     Toptal currently serves over 1,000 clients ranging from large Fortune 500 companies to small and medium sized businesses.  Toptal has grown to more than several hundred core team members working remotely, who in turn help match a global talent network comprising several thousand select independent contractors.

27.     Toptal is a fully remote, fully distributed global company with no physical offices and believes it is currently the world's largest fully distributed workforce.  While many companies may now allow or encourage remote work, especially following the Covid-19 pandemic, for a decade prior to the pandemic and continuing to this day Toptal has utilized its proprietary system to manage a fully remote operation connecting Talent and clients on a global basis.  Toptal developed its systems and expertise at managing teams of employees, consultants, contractors, and talent working remotely and distributed across time-zones through years of painstaking experience.

INDEX NO. 653677/2021

RECEIVED NYSCEF: 05/23/2024

28.     Under Toptal's model, clients can, within hours, access top freelance Talent globally who possess the right skill set and experience for the client's particular need, for temporary full-time or part-time projects, without incurring relocation costs or the wait time associated with other staff augmentation providers.

29.     Over the course of more than a decade, Toptal developed and refined a proprietary platform and process for attracting potential Talent and vetting the thousand applications it receives each month.  Fewer than 3% of the freelancers who apply pass the screening process and are invited to join Toptal's curated freelance talent network.

30.     Toptal's Talent applicants are subjected to a rigorous screening process that is at the heart of Toptal's business model, which assesses applicants' qualifications using a blend of proprietary software and online interviews.  It includes (i) a proprietary language test to ensure high level English language fluency and communication skills, (ii) a proprietary personality test to probe personality traits and identify passionate and driven individuals, (iii) proprietary technical knowledge and skills tests, (iv) problem solving abilities tests by way of a live screening by experts in the particular fields, and (v) a proprietary test project for the applicant to work on their own.

31.     Toptal expended significant time and resources to develop its Talent recruiting, supply, and screening methods over many years.  The details and parameters of Toptal's screening process are confidential and proprietary, and they allow Toptal to ensure that its Talent pool is reliably capable of addressing its clients' needs.

32.     Once an applicant is accepted into Toptal's Talent pool, he or she gets access to Toptal's proprietary digital platform to match for positions with Toptal's clients.

33.     Toptal uses proprietary, confidential software and trained matchers to find the perfect fit between a client's needs and the available freelancers in its curated Talent network.

13

Toptal expended significant time and resources creating this digital platform and its method for matching Talent with Toptal's clients. Toptal's platform for matching clients with Talent is engineered to quickly find and match suitable Talent for Toptal's clients on a near instantaneous, on-demand basis.

34.     Toptal's clients pay Toptal an all-in negotiated rate, and Toptal pays the Talent the rate that such Talent has set for itself.

35.     As compensation for its screening and matching service and for certain associated administrative tasks, Toptal earns a margin equal to the difference between what its clients pay Toptal and what Toptal pays to its Talent with respect to any particular engagement.

36.     Having developed Toptal's proprietary screening process, pool of Talent and matching process at a substantial cost, and having trained Toptal Personnel on how to vet and match Talent candidates and curated a large global Talent network of thousands of the world's top talent over more than a decade, Toptal developed a substantial commercial advantage over other companies that purport to do similar talent searches and on demand talent sourcing.

37.     This painstakingly accumulated know-how and the Talent relationships are critical to Toptal's business model because they enable Toptal to continue to identify, vet, and match candidates who would provide excellent services to Toptal's clients. It also causes such clients to retain, and then continually return to, Toptal for their talent needs, trusting that Toptal can effectively and successfully manage remote-working teams of freelance Talent without sacrificing the quality of the work product.

38.     Toptal's processes and Talent relationships are closely guarded trade secrets and confidential information within Toptal and amongst Toptal Personnel. Toptal Personnel are required as a condition of their engagement with Toptal to sign confidentiality and non-solicitation

14

agreements that prohibit (i) use of its trade secrets or confidential information except for Toptal's benefit and (ii) solicitation of Toptal Personnel, Talent, or clients during their term with Toptal and for a reasonable period thereafter.

39.     These protections are critical for Toptal because some Toptal Personnel have access to Toptal's application vetting procedures and many sit in managerial, client-facing or Talent-facing positions such that those persons' knowledge and goodwill of Toptal become synonymous with the knowledge and goodwill of the particular employee or contractor.  Moreover, because these Toptal Personnel get access to potential clients, they can identify which potential clients are ripe for client development, and they know whom to approach at such clients and how to work with such clients to take on Toptal Talent to work remotely on projects.

40.     The products and procedures for vetting (other than general descriptions) and the list of identities of Toptal's Talent pool (for which there is no public directory apart from a select few profiles publicized to showcase the experience and expertise of representative Talent) are closely held trade secrets and/or confidential information that are provided only to Toptal's trusted Toptal Personnel, who are obligated under their respective agreements, as well as by virtue of their positions of trust and authority, to preserve the secrecy and confidentiality of Toptal's trade secrets and business information.

41.     The products and procedures for vetting and the list of identities of the individuals in Toptal's Talent pool cannot be discovered without either substantial efforts and financial investment or improper means.  Similarly, Toptal's client lists and contacts are kept secret and cannot be discovered without either substantial efforts and financial investment or improper means.  No one besides Toptal can discover or replicate these lists or discover the Talents' or

15

clients' identities without the extensive expenditures and efforts made by Toptal over the course of more than a decade.

42.     Thus, the only way a competitor could recreate Toptal's products, processes, and successes – and to rapidly develop the same – would be to lure away a critical mass of Toptal Personnel and leverage those individuals' knowledge of Toptal's confidential and proprietary products, methodologies, processes, and databases.

43.     Although some of Toptal's trade secrets and confidential information is documented, the universe of such trade secrets is not reduced to a single writing, manual, or directory.  Such information may be learned by Toptal Personnel during the course of their engagement by Toptal and may reside in their memories.

44.     During the course of discovery, Toptal has provided a highly confidential appendix (subject to the Court's confidentiality order) identifying to Andela Toptal's trade secrets and confidential information that the Former Toptal Personnel at Andela had access to while at Toptal, which evidences information that may have been misappropriated by Andela and/or the Former Toptal Personnel at Andela that belonged to Toptal.  Toptal has also produced underlying documents evidencing such trade secrets.

45.     Toptal employs extensive measures and expends significant sums to protect and guard these trade secrets and confidential information and prevent dissemination to its competitors, including without limitation requiring Toptal Personnel to execute confidentiality agreements, including confidentiality requirements within the written policies for Toptal Personnel, password-protecting access to Toptal Personnel portals, restricting access to certain data to certain individuals within Toptal, monitoring emails to and from Toptal's servers, and sending periodic

reminders to Toptal Personnel of their contractual obligations to Toptal, including with respect to proprietary and confidential information and the post-termination survival of those obligations.

46.     Toptal's relationships with its clients – and client contacts – have been generated and cultivated by Toptal over many years and at a substantial cost, including without limitation, marketing efforts and consistent delivery of top, effective, and efficient Talent, who have been vetted through Toptal's proprietary process and effectively matched with clients.

47.     As a result, Toptal has fostered and continues to maintain loyalty and goodwill in the marketplace.  By maintaining client relationships and goodwill, Toptal is able to secure requests for Talent matching from new clients and increased requests from existing clients. Conversely, if these relationships are severed or Toptal's goodwill is tarnished, Toptal's future business prospects and revenues will materially diminish.

## II.    Andela Recognizes the Strategic Value of Toptal Know-how and Relationships and Seeks to Recreate it Using Improper Means

48.     Andela built its business by creating and operating physical hubs in various African countries such as Nigeria, Kenya, Rwanda and Uganda, where it housed engineers to provide outsourcing services to its clients but did not provide fully remote services like Toptal.  At its African-based physical hubs, Andela provided its limited pool of contractors – generally citizens of those local countries – with housing, food, and training.

49.     Andela has long recognized the strategic value of Toptal's know-how, global reach, and remote footprint, as well as its deep Talent and client relationships.  Andela has cast an envious eye at Toptal's global success and remote methods of operations – acknowledging the extent to which those aspects of Toptal would help Andela to expand its own limited offerings.

50.     Beginning in or about 2015, Andela's CEO Jeremy Johnson reached out to Toptal's CEO, Taso Du Val, seeking to partner with Toptal to supplement areas in which Andela's business

Case 1:24-cv-04027-JHR-JW    Document 1-5    Filed 05/24/24    Page 19 of 77

was lacking, including in mentoring programs and addressing the needs of larger clients which Andela did not have the resources to support.

51.     In 2018, Mr. Johnson reached out to Mr. Du Val about supplementing Andela's talent pool with Toptal Talent.  Mr. Johnson advised that although Andela had numerous junior developers, it had an increasing shortage of more senior developers.  At the time, Mr. Johnson stated that his company had a shortfall of 20-30 senior developers and predicted that Andela would experience a shortage of a couple hundred senior developers the next year.

52.     Toptal did not see any strategic advantage to Andela's overtures, apparently leading Andela to try to seize by improper means what it had sought to obtain, and proceeded to poach a critical mass of Toptal Personnel in an attempt to improperly replicate Toptal's proprietary and confidential processes without having to spend the time, effort, and resources of building its own business model.

53.     Andela's press releases and media coverage since 2019 demonstrate that it is sought to replicate and usurp Toptal's business as the premier provider of remote, fully distributed "top talent" to the world's foremost companies.

54.     In January 2019, Mr. Johnson announced that Andela had received $100 million in Series D funding from various venture capital funds and that it intended to use this newly raised money to expand its offerings of software development in Africa.

55.     Nonetheless, by September 2019, Andela had let go 420 junior engineers in Kenya, Uganda and Nigeria and by June 2020 had to lay off 135 of its employees.  Upon information and belief, after many years of failed attempts to establish a viable business model and increasingly beholden to venture backers who had sunk over a hundred million dollars into his company, Andela's CEO seized on an idea born of Andela's desperation.  Instead of seeking to find a viable

18

business model to compete fairly, Andela was going to copy a proven successful business model and morph into a copycat of Toptal as a fully remote company that curates a global remote Talent network and matches those Talents with its clients, and double its supposed enterprise valuation.

56.     In July 2020, Andela announced that it was no longer only going to source talent working in its African hubs but instead was going fully remote and opening to the wider African continent for engineering talent, thereby scaling up from access to an applicant pool of 100,000 engineers to more than 500,000 engineers across the continent in a bid to cut its operating costs drastically.  Market observers and people in the software engineering community and other markets served by Toptal immediately recognized and publicly commented on Twitter and other social media that Andela was seeking to just copy and become Toptal – not that it was looking to compete with Toptal or compete more effectively with Toptal.

57.     Andela was not content with trying to figure out how it could compete with Toptal but instead tried to reconfigure Andela itself to emulate it.  At or about the time it was making its public announcements about its drastic changes in strategic focus (changes that multiple commenters on Twitter and other social media at the time explained and characterized as "Andela becomes Toptal"), internally, Andela's CEO was leading its campaign to hire a critical mass of Toptal Personnel and download their collective knowledge of Toptal's inner-workings.

58.     Beginning at least as early as 2020, Andela engaged in an elaborate and carefully orchestrated campaign to unlawfully misappropriate for its own benefit information *in the memories* of the Former Toptal Personnel at Andela whom Andela targeted and recruited, in violation of their confidentiality agreements.

59.     In April 2020, Mr. Johnson, Andela's CEO, reached out to a former Princeton classmate of his, Breanden Beneschott, who had served as Toptal's chief operating officer from

Case 1:24-cv-04027-JHR-JW    Document 1-5    Filed 05/24/24    Page 21 of 77

November 2010 until he was terminated for cause in November 2018. Mr. Johnson also reached

out to Mr. Oliveira. At the time, Messrs. Beneschott and Oliveira both worked at Mechanism

Ventures, LLC, with Mr. Beneschott serving as its CEO and Mr. Oliveira as its Product Principal.

60.     Mr. Johnson wanted to tap into the memories and Toptal experiences of Messrs.

Beneschott and Oliveira and asked them to provide names of former Toptal finance, operations,

and talent people because Andela was planning "to go on a bit of a hiring spree to rebuild after this

transition." Messrs. Beneschott and Oliveira offered up a host of names and actually made a

number of key introductions of former Toptal Personnel to Mr. Johnson to interview in order to

download confidential information concerning Toptal from their collective memories.

61.     In order to attempt to replicate Toptal's success, Andela orchestrated a series of

multiple interviews with certain former key Toptal Personnel (including *without limitation* Mr.

Beneschott, Ms. Machi, Mr. Oliveira, Mr. Bhagwata, Ms. Peters, Mr. Bacinger, Mr. Kearns[3] and

Mr. Boyette), many of whom Andela actually engaged as employees or independent contractors.

In the case of Mr. Beneschott, formerly Toptal's COO, Mr. Johnson offered him a position on

Andela's board of directors.

62.     Mr. Johnson himself personally participated in several of these interviews, took

advice from other executives at Andela concerning lines of questioning to pursue regarding how

to build processes like Toptal's, and shared his notes with other Andela executives and key

stakeholders.

63.     For example, in text messages, Mr. Johnson was asked, "Have you asked about how

Toptal handled critical skillsets in high demand between engagements? Lots of pressure to figure

out how to 'keep' hot skills and not return to the bench in zero bench group."

---

[3] Mr. Kearns was the VP of Enterprise at Toptal until March 2020 when he left Toptal's employ.

20

64.     In another text message, Andela's Chief Revenue Officer asked Mr. Johnson to ask a Toptal interviewee, "***how do we build the kind of inbound engine like toptal has so we can reduce reliance on SDRs***" [sales development representatives].

65.     Andela used information gleaned from the former Toptal Personnel to compile a comprehensive summary of Toptal business in various key functional areas in the Toptal Info Compendium.

66.     The Toptal Info Compendium goes into painstaking detail about central elements of Toptal's key functional areas, including Toptal's pricing, technology, bench, sales, finance/accounting, legal, delivery and network community, and how Toptal had managed to solve for the challenges that running a global, remote operation and source and match clients with Talent on demand, and at scale – all seemingly based on information elicited from interviews with or documents provided by these former Toptal Personnel.

67.     On April 30, 2020, one Andela employee wrote to an Andela executive about the Andela "redesign" project she was working on, explaining that Mr. Johnson (Andela's CEO) had instructed her that his ***"[d]irect orders are to rip off Toptal."***

68.     In June 2020, in furtherance of this CEO-led Andela plan to "rip off Toptal," Mr. Johnson produced a flow chart that outlined Toptal's various operational and business processes, which Andela referred to as the "Toptal Process Flow" and directed the executives that reported to him and others at Andela to use it and ask questions so that Andela could further hone its understanding and replication of Toptal's processes.

69.     On June 15, 2020, Andela provided an individual it had newly hired as a Strategy and Operations Analyst copies of an onboarding document that provided a checklist of tasks that the new hire was required and expected to complete as part of joining Andela; included on that

onboarding checklist was a requirement that the new hire of *Andela* review and familiarize himself with the *Toptal* Info Compendium as well as the "*Toptal* Process Flow."

70.     Upon information and belief, other new hires at Andela at the time were also given access to and required and expected to study the *Toptal* Info Compendium and the *Toptal* Process Flow as part of joining *Andela*—all in line with Andela's objective of cloning Toptal's processes on the cheap in order to quickly replicate Toptal's success and attract new investment dollars.

71.     Multiple internal Andela documents demonstrate that Andela routinely elicited information about how Toptal worked operationally from various Former Toptal Personnel at Andela and systematically sought to replicate at Andela key elements of Toptal's internal processes or otherwise sought to exploit their remembered knowledge of Toptal proprietary information.

72.     In other instances, Andela was able to elicit more than the memories of Former Toptal Personnel at Andela or others former Toptal personnel. Documents in Andela's files in certain instances appear to be internal Toptal documents (or copies made from internal Toptal documents), that likely were provided to Andela by former Toptal Personnel.

73.     For example, Toptal found open, public access to Andela's Confluence (an enterprise knowledge management system) that appeared to include entire documents copied verbatim from Toptal's own internal confidential documents, right down to the case-sensitivity.

74.     In September 2020, as set forth more fully in Section V below, Toptal's outside counsel wrote a letter to Andela requesting written assurances that Andela was not hiring former Toptal Personnel (Mr. Bhagwata and Ms. Machi) in a manner that would cause them to breach their contractual obligations to Toptal, but that letter was entirely ignored by Andela as it

22

audaciously forged ahead with its campaign to poach additional key Toptal Personnel, notwithstanding their ongoing contractual obligations to Toptal.

75.    Andela did all this with a guilty mind.  Mr. Johnson instructed Mr. Bhagwata in a text message, ***"[j]ust for your benefit, let's discuss anything tt [Toptal] related here,"*** since ***"in the super rare chance we do go to court they [Toptal] can try to pull company email and slack messages so just better to stay safe."***

76.    In other words, Mr. Johnson instructed Mr. Bhagwata that it would be safe to steal with impunity via messaging on personal devices, because he mistakenly thought such communications would go undetected even if Toptal sought to vindicate its valuable proprietary and confidential trade secrets and other legal and business interests in a court of law.

77.    In a September 2020 WhatsApp message from Ms. Machi to Mr. Johnson, she suggested that Mr. Johnson consider a candidate from Toptal for the new head of sourcing position at Andela.  Ms. Machi further suggested that Mr. Johnson discuss the candidate with Mr. Beneschott and Mr. Oliveira, both of whom had interacted with the candidate more while at Toptal. Mr. Johnson did not caution Ms. Machi about the importance of upholding her ongoing obligations to Toptal. Far from it.  He instead pursued the improperly referred candidate despite that he knew or should have known that Machi was subject to a nonsolicitation obligation to Toptal.

78.    In December 2020, Mr. Bhagwata texted Mr. Johnson that he was communicating with Toptal personnel about joining him at Andela, "Oh man TT [Toptal] enterprise is doomed. … All kinds of crap happening there, getting calls from my team members. They are going to die a natural death there."  Mr. Johnson did not remind Mr. Bhagwata of his need to uphold his post-employment contractual obligations to Toptal.  On the contrary, Mr. Johnson callously took apparent pleasure in the reports of Toptal's imminent demise: "Karma is a bitch[.]"

23

79.     Andela did not hire the Former Toptal Personnel at Andela based on their individual merits, but because of their collective ability to divulge Toptal's trade secrets and confidential information.

80.     For example, in February 2021, Andela's then Director of Product Design commented to a colleague that Ms. Machi was insufficiently experienced and generally ineffective in her role as Andela's Vice President of Product but for the fact that Andela wanted her to focus and devote her energies, along with those of others at Andela, onhow things were done at Toptal and build another Toptal at Andela—much to the ire of the Andela legacy personnel who complained among themselves that "WE ARE NOT FUCKING TOP TAL."

81.     The colleague asked the Director of Product Design, ***"Ok so we're building toptal?"*** The Director responded, ***"Yup because J[eremy Johnson] over-indexed on Toptal when we started moving away from the bench and literally went and bought all Toptal ppl … Courtney, Leando, etc. … Ppl dont even care about what we are doing because we're just building a Toptal…. I was deep in the website project (directive was to 'just make it like Toptals').***"

82.     In April 2021 – after it had acquired a critical mass of former Toptal Personnel and their knowledge of Toptal's proprietary business systems, models, and methodologies, including its all-remote and global Talent network – Andela announced that it was abandoning its historic focus on Africa and was going "global" and "100% remote" beginning a global expansion of its talent network in 37 countries only months after going remote across Africa.

83.     In other words, once Andela had poached key personnel from Toptal, and gained invaluable access to how Toptal addresses the challenges of operating a global talent network with a fully remote footprint, Andela proceeded to rapidly rebrand itself and use Toptal's former

personnel to provide it with Toptal's proprietary business information and to solicit Toptal's clients, vetted Talent, and additional core personnel globally.

84.     Andela's copycatting of Toptal was so comprehensive, thorough, and brazen that it did not escape the notice of various Andela employees, independent contractors or talent.  In conversations with their Andela peers, for example, individuals noted that Andela was "**basically turning into TopTal**," and that Andela "**has switched to a toptal type of model.** It no longer favours African Developer like the initial goal."

85.     In one exchange of text messages, one individual sarcastically noted to a peer that Andela was "**building a new data team … [f]rom our beloved TopTal**" and that of the participants on one call "90% were from TopTal," and expressed shock at how brazen the Andela-led theft and misappropriation of Toptal proprietary information was:  "[w]hen you check the history of the doc **you'll see the content was copy pasted … So they are taking documents from Toptal before they yank them off the system.**"

86.     Even following the commencement of this action in June 2021, Andela has continued targeting former Toptal Personnel for hiring.

87.     By September 2021, Andela boasted publicly that it had achieved a $1.5 billion valuation and was able to leverage its "Andela 2.0" to attract $200 million of Series E investments from prominent, wealthy and influential investors, led by SoftBank Vision Fund 2, and including the Chan Zuckerberg Initiative, Whale Rock, Generation Investment Management, and Spark Capital.

88.     In its press releases at the time, Mr. Johnson described the new Andela essentially as a copycat of Toptal, and trusted financial markets media outlets like Bloomberg, Forbes and others reported that Andela had finally achieved "unicorn" status as a company with a valuation

of over \$1 billion – something that had long eluded Andela since its founding and which had only become possible once Andela redesigned itself with purloined Toptal proprietary information and people and presented itself in a new "2.0" version of itself, which was a barely disguised, rapidly assemble, copycat version of Toptal populated with dozens of former key Toptal personnel.

89.     Indeed, Mr. Johnson appears to have forwarded interview notes from at least one former Toptal executive to multiple investors, including Lilly Wollman and Anthony Woolf of Generation Investment Management and Vivian Wu of the Chan Zuckerberg Initiative, and possibly others—all as part of a conscious effort by Andela's CEO to help prospective investors in *Andela* better understand *Toptal*.

90.     In October 2021, a Former Toptal Personnel at Andela actually noted to his colleagues that, in effect, Andela had become Toptal: "***What Andela is offering is pretty much the same as Toptal*, engineers coming from the same regions, similar or same experience and the rates are not that different.**"

### III.     Prior Toptal Personnel and Their Contractual Obligations

91.     Toptal previously employed or engaged as independent contractors, and entered confidentiality and/or non-solicitation agreements, with the thirty (30) Former Toptal Personnel at Andela identified in the footnote on the first page hereof, each of whom was, by virtue of his or her position with Toptal, given access to Toptal's confidential information and Talent.

92.     By way of illustration concerning the obligations Former Toptal Personnel at Andela had to Toptal, Toptal provides information concerning the following ten individuals:

### a.  Defendant Courtney Machi

93.     Ms. Machi was engaged by Toptal on May 22, 2017, with the title "Senior Product Manager" and went on to serve as "Director of Product" at Toptal.

26

94.     Ms. Machi reported to the Vice President of Product at Toptal.  Ms. Machi worked on projects meant to customize and scale Toptal's platforms for its operations.  She understood the customized suite of software that makes up Toptal's proprietary platform, including how it was configured and how the different components interacted with one another.  Ms. Machi was therefore privy to virtually every aspect of Toptal's business, and the information she holds is invaluable for a competitor seeking to replicate Toptal's operational success in solving for the significant logistical and other process challenges of creating a fully remote company on a global scale with the ability quickly match clients and talent on demand and at scale, in large volumes. These were precisely among the types of challenges that Andela realized it needed to solve for in its desire to copycat Toptal's model—and success.

95.     Ms. Machi has publicly explained that, prior to joining Toptal, she did not possess or have the knowledge or experience to successfully run a fully remote product team but that, having gained that knowledge and experience during her tenure at Toptal, she now possesses and is able to offer knowledge on how best to manage the myriad of challenges presented by a fully remote company.

96.     Ms. Machi entered into an employment agreement with Toptal in which she agreed in Section 4 that:

> all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company [i.e., Toptal] or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except in the scope of and as authorized during my employment, use any Proprietary Information.

97.     Section 5 of her agreement provides that for a period of one (1) year after the term of her employment with Toptal Ms. Machi "will not, for any reason whatsoever, whether

27

personally or in association with others, and whether on behalf of or in conjunction with any entity

or person, directly or indirectly, encourage, solicit, aid in the solicitation of, persuade or recruit, or

attempt to solicit, induce, encourage, persuade or recruit, any employee, independent contractor or

consultant" to leave Toptal, as more fully set forth in the Agreement.

98.     Section 7 provides that for a period of one (1) year after the term of her employment

with Toptal, Ms. Machi:

> will not, for any reason whatsoever, whether personally or in association, and whether on behalf of or in conjunction with any entity or person, directly or indirectly (a) call upon or solicit any client, customer or account of Company or any of its subsidiaries, affiliates or divisions (referred to collectively as the "Company Group") for the purpose of inducing or causing that client, customer or account to cease doing business or to modify its relationship with Company Group, or for the purpose of selling or providing to any such client, customer or account any products or services offered by (or that compete with the products or services offered by) Company Group, (b) entice, divert, or take away any client, customer or account of Company Group, or attempt to do the same, or (c) accept business from, conduct business with or consult with any client, customer or account of Company Group, or attempt to do the same.

99.     Section 8 provides that for a period of one (1) year after the term of her employment

with Toptal, Ms. Machi:

> will not, for any reason whatsoever, whether personally or in association, and whether on behalf of or in conjunction with any entity or person, directly or indirectly: (a) maliciously or willfully interfere or attempt to interfere with or maliciously or willfully hinder the business relationship of Company Group with any business partners, clients, customers, referral sources, suppliers or vendors doing business with Company Group; or (b) solicit, persuade, encourage, induce or entice any business partners, clients, customers, referral sources, suppliers, vendors or others with a contractual relationship with Company Group to terminate or otherwise restrict, limit, reduce or modify their contractual or other relationship or business dealings with Company Group, or any of its officers, directors, employees, or agents.

100.    In Section 11 of the agreement, Ms. Machi agreed that "that Company is entitled to

communicate my obligations under this Agreement to any future employer or potential employer

of mine."

101.    Finally, in Section 12, Ms. Machi agreed:

I also understand that any breach of this Agreement will cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond. Further, in any legal action or other proceeding in connection with this Agreement (e.g., to recover damages or other relief), the prevailing party will be entitled to recover, in addition to any other relief to which it may be entitled, its reasonable attorneys' fees and other costs incurred in that action or proceeding.

102.    As discussed herein, in April 2020, Ms. Machi left Toptal and immediately joined Andela.

**b. Sachinkumar "Sachin" Bhagwata**

103.    Mr. Bhagwata was engaged as a member of Toptal's core team on September 26, 2017, with the title "Client Partner." His job responsibilities included cultivating existing client relationships and selling additional Toptal services to them.

104.    In early 2020, Toptal appointed Mr. Bhagwata as the Interim VP of Enterprise, in which role he became responsible not only for existing client relationships with Toptal's largest and most sophisticated "enterprise" clients, but also for Toptal's marketing efforts and cultivating potential new clients for Toptal's services.

105.    Mr. Bhagwata entered into an agreement with Toptal in which he agreed in Section 2.B:

that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization" of Toptal.

106.    As defined in the agreement, "Company Confidential Information" means:

29

information that the Company has or will receive, develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By way of example, and without limitation, Company Confidential Information includes any and all non-public information that relates to ***the actual or anticipated business and/or products, research or development of the Company,*** or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, ***customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment),*** software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, *marketing, finances,* and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. [Emphases added.]

107.    In Section 6, Mr. Bhagwata agreed that "[u]pon separation from employment with the Company, I agree to immediately sign and deliver to the Company the 'Termination Certification' attached hereto as APPENDIX C."

108.    In Section 7 of his agreement, Mr. Bhagwata agreed that if he left his employment with Toptal, he consented to Toptal notifying his "new employer about my obligations under this Agreement."

109.    In Section 8 of his agreement, Mr. Bhagwata agreed:

that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not either directly or indirectly solicit, induce, recruit or encourage, or attempt to solicit, induce, recruit or encourage any of the Company's employees to leave their employment or become employed by any other employer or third party, including either for myself or for any other person or entity. .

30

110.    As discussed herein, Mr. Bhagwata left Toptal in August 2020 and joined Andela almost immediately thereafter.

### c. Martin Chikilian

111.    Mr. Chikilian was engaged as a member of Toptal's core team pursuant to an agreement entered on October 3, 2011, and most recently served in the role of Toptal's Head of Talent Operations.  Upon information and belief, prior to joining Toptal, Mr. Chikilian had no experience in the field of technical recruiting in which Toptal (and now Andela) operate.

112.    On June 26, 2018, Mr. Chikilian entered into a new agreement with Toptal.

113.    Mr. Chikilian's services for Toptal included leading Toptal's team of recruiters that matched Talent with Toptal clients, improving the matching processes and defining the requirements for new internal tools and features that could scale with the growth of Toptal.

114.    Section 2(b) of Mr. Chikilian's agreement with Toptal provides:

Contractor agrees that all Inventions and all other business, technical, and financial information (including, without limitation, the identity of and information relating to any Client, customers, Contractors, or other Toptal consultants) developed, learned, or obtained by or for or on behalf of Contractor in connection with the Services or that otherwise relate to Toptal, any Client or the business or demonstrably anticipated business of Toptal, or any Client or that are received by or for Toptal in confidence, constitute "Proprietary Information." ***Contractor shall hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information.*** [Emphasis added.]

115.    Section 2(c) provides, in part:

As additional protection for Proprietary Information, to the fullest extent permitted under applicable law, Contractor agrees that during the period over which it is to be providing the Services and for six (6) months after the termination of this Agreement for any reason, Contractor will not (i) either directly or indirectly encourage or solicit, or attempt to encourage or solicit, any employee, Contractor or Consultant of Toptal or any Client to leave their employment or engagement with Toptal or such Client for any reason, either for Contractor or for any other person or entity; or (ii) except for the Services provided under this Agreement, enter into an engagement or consulting relationship with or otherwise engage with or perform services for any Client to whom Contractor was introduced or referred in

31

connection with this Agreement (whether or not Services were performed) without Toptal's prior written consent.

116.    In Section 5 of the agreement, Mr. Chikilian agreed further that "Sections 2 (subject to the limitations set forth in Section 2(c)) through 12 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration. Toptal may communicate the obligations contained in this Agreement to any other (or potential) client or employer of Contractor."

117.    In Section 10, Mr. Chikilian agreed:

to defend, indemnify, and hold harmless Toptal, Client, and their respective affiliates, officers, directors, employees, agents, successors, and permitted assignees from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, attorneys' fees, or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from … (b) Contractor's breach of any representation, warranty, or obligation under this Agreement; or (c) Contractor's negligence, bad-faith, or misconduct.

118.    As discussed herein, Mr. Chikilian left Toptal in September 2019, and joined Andela in approximately November 2020.  In between, he worked at Mechanism Ventures, under the direction of Messrs. Oliveira and Beneschott.

119.    While Mr. Chikilian was working at Mechanism Ventures, Mr. Beneschott and Mr. Oliveira allowed him to consult for Andela for at least 10-hours per week during November 2020, during which time he provided Andela with critical knowledge about Toptal and its business model.  Mr. Oliveira and Mr. Beneschott then gave Mr. Chikilian their blessing to leave Mechanism Ventures and join Andela full-time.

### d.  Alvaro Oliveira

120.    Mr. Oliveira was engaged as Toptal's "Director of Engineering and Recruiting" on March 1, 2011, and subsequently served as "Vice President of Talent Operations."  Mr. Oliveira

left Toptal in March 2018 but returned to Toptal on June 1, 2018, and remained with Toptal until

April 12, 2019.

121.    Mr. Oliveira's job responsibilities initially included helping to cultivate and grow

the Toptal Talent network and help iterate the processes and software for Toptal's platform that

matched its clients and Talent.  Subsequently, Mr. Oliveira's job responsibilities included scaling

Toptal's Talent network globally and refining the processes and tools whereby Toptal could recruit

and screen talent and supply the talent in its global network to clients rapidly in an on-demand

mode.  While at Toptal, Mr. Chikilian reported to and worked closely with Mr. Oliveira during

much of their overlapping tenures.

122.    On May 31, 2018, Mr. Oliveira entered into a new agreement with Toptal.  Section

2(b) of his agreement provides:

> Contractor agrees that all Inventions and all other business, technical and financial
> information (including, without limitation, the identity of and information relating
> to any Client, customers, Contractors, or other Toptal consultants) developed,
> learned or obtained by or for or on behalf of Contractor in connection with the
> Services or that otherwise relate to Toptal, any Client or the business or
> demonstrably anticipated business of Toptal or any Client or that are received by
> or for Toptal in confidence, constitute "Proprietary Information." ***Contractor shall
> hold in confidence and not disclose or, except in performing the Services, use any
> Proprietary Information.*** [Emphasis added].

123.    Section 2(c) of his agreement provides:

> As additional protection for Proprietary Information, to the fullest extent permitted
> under applicable law, Contractor agrees that (i) during the period over which it is
> to be providing the Services and for six (6) months after the termination of this
> Agreement for any reason, Contractor will not: (a) either directly or indirectly
> solicit for employment or consulting services any person who is, or within the
> previous twelve (12) months has been, an employee or consultant of the Company
> or of any Client to whom Contractor was introduced or referred in connection with
> this Agreement, either for Contractor or for any other person or entity; (b) take any
> action that could reasonably be expected to have the effect of encouraging or
> inducing any employee of the Company to leave the Company for any reason
> (except for the bona fide firing of Company personnel within the scope of my
> engagement with the Company); or (c) except for the Services provided under this

33

Agreement, enter into an engagement or consulting relationship with or otherwise engage with or perform services for any Client to whom Contractor was introduced or referred in connection with this Agreement (whether or not Services were performed) without the Company's prior written consent; and (ii) during the period over which Contractor is to be providing the Services and for one year after the termination of this Agreement for any reason, except for Services provided under this Agreement, Contractor will not, directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity with any business that develops, manufactures or markets any products,  or performs any services, that are competitive with the products or services of the Company, in each case, in any of the States of the United States or countries within the world. Notwithstanding the foregoing, this section shall not prohibit any possible investment in publicly traded stock of a company representing less than one percent of the stock of such company, and general solicitations of employment that are not specifically targeted to employees of the Company or of a Client to whom Contractor was introduced or referred in connection with this Agreement, and the hiring of any person resulting from any such general solicitation, shall not be prohibited by this section.

124.    As discussed herein, Mr. Oliveira left Toptal on April 12, 2019.  In April 2021, Mr. Oliveira publicly announced that he had joined Andela in an executive capacity after, upon information and belief, clandestinely working and consulting for Andela since some time in 2020.

125.    Like Mr. Chikilian, Mr. Oliveira worked for Mechanism Ventures in between working for Toptal and prior to joining Andela, and it is believed that he provided Andela with consulting services wherein he disclosed Toptal proprietary and confidential information during that time.

**e.  Sheryna Goss**

126.    Ms. Goss was engaged by Toptal on April 22, 2019, with the title "Talent Specialist."  Her job responsibilities included recruiting for Toptal's Talent pool.  She worked on the Talent Acquisitions Team together with Ms. McCoy and Ms. Sadovic, who are identified below, and all of whom reported up to and worked with Mr. Chikilian in Toptal's "Talent Ops" department.

127.    Upon information and belief, prior to joining Toptal, Ms. Goss had no experience in the field of technical recruiting in which Toptal (and now Andela) operate and she did not come to Toptal with any existing Talent relationships.

128.    On July 8, 2020, Ms. Goss entered into an agreement with Toptal, in which she agreed in Section 4 that:

> all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain and have developed, learned or obtained during the term of my employment that relate to the Company or the business or demonstrably anticipated business of the Company or that are received or have been received by or for the Company in confidence, constitute "**Proprietary Information**." *Except within the scope of my employment with the Company, I will hold in confidence and will not disclose or use, and I have held in confidence and have not disclosed or used, any Proprietary Information.* [Emphasis added.]

129.    Section 5 of her agreement provided that:

> Until one year after the term of my employment, I will not, directly or indirectly, (i) solicit for employment or consulting services any person who is, or within the previous twelve (12) months has been, an employee or consultant of the Company or (ii) take any action that could reasonably be expected to have the effect of encouraging or inducing any employee of the Company to leave the Company for any reason (except for the bona fide firing of Company personnel within the scope of my employment); provided that general solicitations of employment that are not specifically targeted to employees of the Company and the hiring of any person resulting from any such general solicitation shall not be prohibited by this Section 5.

130.    Section 6 contained restrictive covenants:

> To protect the Company's Proprietary Information and goodwill, I agree that during the term of my employment with the Company (whether or not during business hours) and for one year after the term of my employment (the "Restricted Period"), anywhere in the Restricted Territory (defined below):

>> a) I will not, directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity with any business that develops, manufactures or markets any products, or performs any services, that are competitive with the products or services of the Company, or the products or services that the Company or its affiliates, has under

35

INDEX NO. 653677/2021

RECEIVED NYSCEF: 05/23/2024

> development or that are the subject of active planning as of my last day of employment…
>
> b) I will not, directly or indirectly, in any manner, other than for the benefit of the Company, call upon or solicit business from or with any of the customers of the Company or any of its suppliers, in each case, with whom I had significant contact or learned confidential information about through the course of my employment with the Company.

For purposes of Sections 6(a) and 6(b) of this Agreement, "Restricted Territory" shall mean any of the States of the United States or countries within the world.

131.    As discussed herein, Ms. Goss left Toptal in July 2020 and joined Andela in November 2020.

**f.   Marta McCoy**

132.    Ms. McCoy was engaged by Toptal on August 12, 2019, with the title "Talent Specialist."  Her job responsibilities included talent acquisition – recruiting for Toptal's Talent pool.  She worked on the Talent Acquisitions Team together with Ms. Goss and Ms. Sadovic, who is identified below, all of whom reported up to and worked with Mr. Chikilian in Toptal's "Talent Ops" department.

133.    On July 6, 2020, Ms. McCoy entered into an agreement with Toptal with identical provisions as Ms. Goss's agreement immediately above.

134.    As discussed herein, Ms. McCoy left Toptal in November 2020 and joined Andela immediately.

**g.   Leandro Zanella de Souza Campos**

135.    Mr. Zanella began working with Toptal pursuant to a written agreement on October 24, 2016, as a Data Scientist in its Talent Operations function and worked with Messrs. Oliveira and Chikilian in Toptal's "Talent Ops" department.  Through a reorganization, he moved into a newly developed team of company-wide Business Analysts.  By virtue of his position, Mr. Zanella had an exceptionally broad understanding of Toptal's business functions and platform.

136.    Upon information and belief, prior to joining Toptal, Mr. Zanella was a graduate

student with limited business or technical experience outside of any academic setting.

137.    On September 1, 2020, Mr. Zanella entered into an agreement, which provided in

Section 2(a):

> Contractor agrees that Toptal shall own all right, title, and interest (including all
> Intellectual Property Rights (as defined herein) of any sort throughout the world)
> relating to any and all inventions, works of authorship, designs, know-how, ideas,
> improvements, developments, discoveries, trade secrets and information made or
> conceived or reduced to practice (collectively, "Inventions"), in whole or in part,
> by or for or on behalf of Contractor during the term of this Agreement that relate to
> the subject matter of or arise out of or in connection with the Services or any
> Proprietary Information (as defined below) (collectively, "Work Product").
> Contractor shall assist Toptal (or at Toptal's request, the applicable Client), to
> further evidence, record and perfect such assignments, and to perfect, obtain,
> maintain, enforce and defend any rights assigned.

138.    Furthermore, Section 2(c) of Mr. Zanella's agreement provided non-solicitation

and non-compete covenants for a period of one year, in relevant part as follows:

> As additional protection for Proprietary Information, to the fullest extent permitted
> under applicable law, Contractor agrees that: (i) during the period over which
> Contractor is to be providing the Services and for one (1) year after the termination
> of this Agreement for any reason, Contractor will not: (a) either directly or
> indirectly solicit for employment or consulting services any person who is, or
> within the previous twelve (12) months has been, an employee or consultant of the
> Company or of any Client to whom Contractor was introduced or referred in
> connection with this Agreement, either for Contractor or for any other person or
> entity; (b) take any action that could reasonably be expected to have the effect of
> encouraging or inducing any employee of the Company to leave the Company for
> any reason (except for the bona fide firing of Company personnel within the scope
> of Contractor's engagement with the Company); or (c) except for the Services
> provided under this Agreement, enter into an engagement or consulting relationship
> with or otherwise engage with or perform services for any Client to whom
> Contractor was introduced or referred in connection with this Agreement (whether
> or not Services were performed) without the Company's prior written consent; and
> (ii) during the period over which Contractor is to be providing the Services and for
> one (1) year after the termination of this Agreement for any reason, except for
> Services provided under this Agreement, Contractor will not, directly or indirectly,
> whether as owner, partner, shareholder, director, manager, consultant, agent,
> employee, co-venturer or otherwise, engage, participate or invest in any business
> activity with any business that develops, manufactures or markets any products, or
> performs any services, that are competitive with the products or services of the

37

Company, in each case, in any of the States of the United States or countries within the world. … EXCEPT WITH RESPECT TO A BREACH OF SECTION 2(c)(ii), IN THE EVENT OF ANY BREACH BY CONTRACTOR OF THIS SECTION, CONTRACTOR SHALL PAY TOPTAL THIRTY THOUSAND DOLLARS ($30,000) WITHIN TEN (10) DAYS AFTER SUCH BREACH AS LIQUIDATED DAMAGES. CONTRACTOR AND TOPTAL HEREBY ACKNOWLEDGE AND AGREE THAT TOPTAL'S DAMAGES IN THE EVENT OF SUCH BREACH WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT $30,000 IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES TOPTAL WOULD SUFFER IN THE EVENT CONTRACTOR BREACHES THE FOREGOING, AND THAT SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT.

139.    In addition, Section 10 of Mr. Zanella's agreement provided for an award of attorneys' fees upon a breach of the agreement:

Indemnification. Contractor agrees to defend, indemnify and hold harmless Toptal, Client and their respective affiliates, officers, directors, members, managers, employees, agents, successors and permitted assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, attorneys' fees or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from … Contractor's breach of [any] representation, warranty or obligation under this Agreement …

140.    As discussed herein, Mr. Zanella recently left Toptal in January 2021 and joined Andela immediately.

**h.  Patrick Hennessey**

141.    Mr. Hennessey was engaged by Toptal on May 23, 2018, with the title "Director of Enterprise Analytics" and was subsequently promoted to "Director of Enterprise Performance." His job responsibilities included, amongst other things, creating and managing Toptal's business model for forecasting and measurement used across all supporting cross-functional teams and implementing sales and account management data model to monitor the output and value of Toptal's teams.

142.    Mr. Hennessey entered into an employment agreement with Toptal, in which he agreed in Section 2.B:

38

that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company.

143.    Section 2.A of the agreement defined "Company Confidential Information" to mean:

information that the Company has or will receive, develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By way of example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, ***research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers*** (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, ***processes, formulas,*** technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.  [Emphasis supplied.]

144.    In Section 7 of the agreement, Mr. Hennessey agreed that "[i]n the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement."

145.    In Section 8 of the agreement, Mr. Hennessey agreed that:

during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not either directly or indirectly solicit, induce, recruit or encourage, or attempt to solicit, induce, recruit or encourage any of the Company's employees to leave their employment

39

or become employed by any other employer or third party, including either for myself or for any other person or entity. .

146.     As discussed herein, Mr. Hennessey left Toptal in August 2020 and joined Andela in September 2020.

### i. Dzenana Preljevic-Sadovic

147.     Ms. Sadovic was engaged as a member of Toptal's core team pursuant to a written agreement on October 1, 2015, and provided various services to Toptal throughout the years, most recently serving in the role of Talent Acquisition Lead.  Beginning in 2019, she worked on a team together with Ms. Goss and Ms. McCoy.

148.     Upon information and belief, prior to joining Toptal, Ms. Sadovic had no experience in the field of talent recruiting in which Toptal (and now Andela) operate and she did not come to Toptal with any existing Talent relationships.

149.     On June 22, 2020, Ms. Sadovic, entered into a new agreement with Toptal.

150.     Ms. Sadovic's services for Toptal included leading the Talent Acquisitions Team, establishing and maintaining Toptal's Talent candidate pipeline, building relationships with Talent candidates, and creating channels and strategies to empower cross-team collaboration for more efficient screening of candidates.  She reported up to and worked with Messrs. Oliveira and Chikilian in Toptal's "Talent Ops" department.

151.     Section 2(b) of her agreement provides:

Contractor agrees that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to any Client, customers, Contractors, or other Toptal consultants) developed, learned or obtained by or for or on behalf of Contractor in connection with the Services or that otherwise relate to Toptal, any Client or the business or demonstrably anticipated business of Toptal or any Client or that are received by or for Toptal in confidence, constitute "Proprietary Information." Contractor shall hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information.

40

152.    Section 2(c) of her agreement provides:

As additional protection for Proprietary Information, to the fullest extent permitted under applicable law, Contractor agrees that (i) during the period over which it is to be providing the Services and for six (6) months after the termination of this Agreement for any reason, Contractor will not: (a) either directly or indirectly solicit for employment or consulting services any person who is, or within the previous twelve (12) months has been, an employee or consultant of the Company or of any Client to whom Contractor was introduced or referred in connection with this Agreement, either for Contractor or for any other person or entity; (b) take any action that could reasonably be expected to have the effect of encouraging or inducing any employee of the Company to leave the Company for any reason (except for the bona fide firing of Company personnel within the scope of my engagement with the Company); or (c) except for the Services provided under this Agreement, enter into an engagement or consulting relationship with or otherwise engage with or perform services for any Client to whom Contractor was introduced or referred in connection with this Agreement (whether or not Services were performed) without the Company's prior written consent; and (ii) during the period over which Contractor is to be providing the Services and for one year after the termination of this Agreement for any reason, except for Services provided under this Agreement, Contractor will not, directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity with any business that develops, manufactures or markets any products, or performs any services, that are competitive with the products or services of the Company, in each case, in any of the States of the United States or countries within the world. Notwithstanding the foregoing, this section shall not prohibit any possible investment in publicly traded stock of a company representing less than one percent of the stock of such company, and general solicitations of employment that are not specifically targeted to employees of the Company or of a Client to whom Contractor was introduced or referred in connection with this Agreement, and the hiring of any person resulting from any such general solicitation, shall not be prohibited by this section.

153.    As discussed herein, Ms. Sadovic left Toptal in December 2020 and joined Andela in January 2021.

**j.  Eryn Peters**

154.    Ms. Peters started working at Toptal on February 29, 2016, with the position "Sales Engineer," and she quickly moved to leadership/executive roles as Head of Community and her final role as Head of Talent Strategy reporting to Mr. Oliveira.

41

155.    On February 17, 2016, Ms. Peters entered into an agreement with Toptal, which included identical confidentiality terms identical to those set forth for Ms. Sadovic above.

156.    Section 2(c) of Ms. Peters' agreement further provided, in relevant part:

As additional protection for Proprietary Information, Contractor agrees that during the period over which it is to be providing the Services and for six (6) months thereafter, Contractor will not (i) directly or indirectly encourage or solicit any Contractor or consultant of Toptal or any Client to leave Toptal or such Client for any reason, or (ii) except for the Services provided under this Agreement, enter into an engagement or consulting relationship with or otherwise engage with or perform services for any Client to whom Contractor was introduced or referred in connection with this Agreement (whether or not Services were performed) without Toptal's prior written consent.

157.    Ms. Peters' contract was terminated by a Contract Termination Agreement and Release on April 11, 2019, pursuant to which she was paid a severance.

158.    Under Section 7 of Ms. Peters' termination agreement, she stipulated:

Contractor reaffirms and agrees to observe and abide by the terms of confidentiality contained in the Contract Agreement and the Code of Conduct, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. Contractor acknowledges that during the course of Contractor's work for and with the Company Contractor had access to a number of highly confidential materials and Contractor specifically represents that Contractor shall refrain from and be prohibited from using any such confidential information in the future. Contractor affirms that Contractor has returned all documents and other items provided to Contractor by the Company, developed or obtained by Contractor in connection with Contractor's work for the Company, or otherwise belonging to the Company.

159.    As discussed herein, Ms. Peters left Toptal and joined Andela in October 2020 in an executive capacity, identifying herself on LinkedIn as Andela's Vice President of Marketing.

## IV.    Andela's Tortious Interference with the Former Toptal Personnel at Andela's Contractual Obligations and Misappropriation by Andela

160.    As set forth above, beginning at least as early as early 2020, Andela has been engaged in a campaign to recruit Toptal Personnel to leave Toptal and join Andela in order to gain access to Toptal's trade secrets, confidential information, and relationships with clients and Talent.

Andela has hired or engaged at least the thirty former Toptal Personnel (including members of Toptal's executive and senior leadership teams) listed above and used them to solicit more.

161. On March 13, 2020, an Andela executive announced Ms. Machi's hiring to other Andela employees saying "yes, I am proud to say we poached her from [Toptal]."

162. The knowledge of the extensive group that Andela poached from Toptal – with its technical knowledge of Toptal's platform, familiarity with Toptal's recruitment process, and relationships with Toptal's Personnel, Talent, and clients – enables Andela to improperly and unfairly replicate Toptal's operations to Toptal's competitive disadvantage, as indicated by Andela's extensive interviewing of such former Toptal Personnel and creation of the Toptal Info Compendium.

163. At least six of the Former Toptal Personnel at Andela misled Toptal in their exit interviews, furtively suggesting that they had various career or life plans – and none of them mentioned Andela. Contradicting their statements to Toptal about future plans, each assumed a nearly identical role at Andela shortly after leaving Toptal.

164. The circumstances and furtive conduct suggest that they were coached by Andela and former Toptal Personnel to conceal their plans to join Andela so that Andela could avoid detection and use improper means to cause the Former Toptal Personnel at Andela to violate their confidentiality and non-solicitation obligations to solicit additional Toptal Personnel and access confidential Toptal information. Certainly, the often-identical responses when asked their post-Toptal plans suggests they were coordinated with each other and orchestrated by Andela.

165. Indeed, some Former Toptal Personnel at Andela entered into employment or independent contractor agreements with Andela, appended to which were was an "Exhibit A-1" acknowledging contractual obligations to Toptal.

43

166.    Andela encouraged and induced the Former Toptal Personnel at Andela to breach their ongoing contractual obligations to Toptal, telling them that they need not worry about their contractual commitments to Toptal, and directed them to freely violate such obligations for the benefit of Andela.

167.    Despite trying to deliberately cover its tracks, and even use WhatsApp in the belief that it could conceal its malicious and tortious behavior, Andela has left a trail of evidence that clearly demonstrates a CEO-led scheme orchestrated by Mr. Johnson to exploit information from former Toptal Personnel like Mr. Beneschott and to assemble at Andela a robust team of Former Toptal Personnel at Andela who individually and collectively would be collaborators in Mr. Johnson's scheme have Andela reinvent itself in the image and likeness of Toptal – something that Andela and its CEO knew and appreciated would require Toptal individuals to violate their legal and ethical obligations to Toptal by sharing Toptal trade secrets and confidential information and even solicit Toptal Talent in breach of their obligations – all for the benefit of Andela.

   a.  **Andela Caused Mr. Chikilian to Breach His Contractual Obligations to Toptal for the Benefit of Andela**

168.    On September 19, 2019, Mr. Chikilian – after eight years at Toptal, in which he held lead Talent recruitment and development positions, particularly focused in overseas locations – resigned from Toptal to work with Mechanism Ventures, another competitor of Toptal's.

169.    Upon information and belief, Mechanism Ventures utilized Mr. Chikilian's knowledge of Toptal's trade secrets and confidential information to develop its own platform and talent recruitment processes, and Mechanism Ventures' CEO, Mr. Beneschott, later blessed Mr. Chikilian accepting a role at Andela.

170.    Beginning in December 2020, Mr. Chikilian had been working for Andela and was previously listed as a member of its leadership team, under the title Head of Talent Operations.

This position appears to be similar to or the same as his prior position at Toptal, where he held the same title.

171.     Andela leveraged Mr. Chikilian to disclose trade secrets or confidential information that he took from an eight-year career at the helm of Toptal's Talent recruitment efforts and is using them for Andela's competitive purposes.

172.     In or about mid-March 2021, Mr. Chikilian posted on his LinkedIn profile that he was seeking talent for Andela: "If you are a software engineer, UI/UX designer, Project or Product Manager, come and join our global network of pre-vetted talent by signing up here: [Link]."

173.     Mr. Chikilian made clear in the post that he was seeking to recruit Talent from Toptal: "***Pro-Tip: if we met each other at some of my past companies***, *chances are* **that** *you can skip the line* to join our network. DM [direct message] if you believe you should so I help you fast-track!" (Emphases supplied).

174.     In other words, Mr. Chikilian has called on Toptal Talent, whom Toptal had vetted through its confidential process, to contact him directly so they could "skip the line" to join Andela's new global network – thereby exploiting his prior and particularized knowledge and relationships with individual Talent from his engagement at Toptal, as well as Toptal's Talent vetting processes.

175.     Additionally, Toptal has learned from one of its key salespersons that Mr. Chikilian was regularly in contact with him in 2020 and around New Year's 2021.  Mr. Chikilian has boasted to this salesperson about the development work was doing at Andela and about how he wanted to expand Andela's talent operations globally.

176.    While engaged by Andela, Mr. Chikilian actively solicited Toptal Talent and Personnel through direct solicitation via LinkedIn message or directing his associates at Andela to solicit such persons.

177.    Among the individuals at Andela who participated with and actively engaged in solicitation of Toptal Personnel and Talent together with Mr. Chikilian were Former Toptal Personnel at Andela, Mr. Bacinger, Ms. McCoy and Ms. Ristic.

178.    Mr. Chikilian directly participated in the solicitation of Mr. Oliveira, Mr. Zanella, Mr. Henn, and Ramiro Palacios, as well as numerous Toptal Talent.

179.    Mr. Chikilian and Andela established a protocol at Andela by which Toptal Talent could be flagged as "pre-vetted" for joining Andela's talent network and made a "big push" for soliciting such persons without additional screening by Andela because "we trust their [*i.e.*, Toptal's] assessment process."

180.    Others at Andela were more direct in their assessments of the wholesale misappropriation by Andela of Toptal's valuable work and trade secrets: "***Toptal is doing the work and spending the money while we rely on their time and effort when we bring those engineers here [to Andela]***."

181.    The goal of Andela's scheme—worthy of Tonya Harding—was not just to steal from Toptal but also cripple it.  One Former Toptal Personnel at Andela even discussed having a Talent who was personally friendly to him sabotage Toptal's business by "***playing [a current Toptal Talent] as a double agent, tank his performance on Toptal side so that I can steal the client.***"

46

Case 1:24-cv-04027-JHR-JW     Document 1-5     Filed 05/24/24     Page 48 of 77

182.     Mr. Chikilian was also instrumental in Andela's redesign efforts and provided at least one substantive presentation to Andela that appears to explain how Toptal's "Talent Ops" was structured and the purpose of each of the roles.

### b. Andela Caused Ms. Machi to Breach Her Contractual Obligations to Toptal for the Benefit of Andela

183.     On April 17, 2020, Ms. Machi resigned from Toptal with the intention of working at Andela.  Ms. Machi is currently listed as a member of Andela's leadership team, holding the title VP of Product.

184.     This position appears to have similar responsibilities to her prior positions as Director of Product and Senior Product Manager at Toptal in which she reported to Toptal's Vice President of Product.  Ms. Machi was one of a small group of Toptal Personnel with access to the entirety of Toptal's platform, and now she is disclosing proprietary information she gained at Toptal concerning the same to build out Andela's products.

185.     Ms. Machi has publicly explained that she is able to offer Andela tested tips and strategies on how best to transition into and manage the myriad of challenges presented by a fully remote company based on her work experience at Toptal and that she did not possess such know-how prior to her employment at Toptal.

186.     In fact, she repeatedly provided Toptal trade secret and confidential information to Andela and acted as an "open book" for anyone at Andela with questions concerning Toptal's trade secrets and confidential information.

187.     Ms. Machi was not just an interviewee who provided material information that was incorporated into Andela's Toptal Info Compendium; Andela executives actually tasked her to edit it and make it easier to understand and implement for Andela.

47

188.    As part of Ms. Machi's onboarding process with Andela, she was required to provide Andela with a "SWOT" (strengths, weaknesses, opportunities and threats) analysis of Toptal.

189.    Also in connection with her onboarding process at Andela, Ms. Machi was required to submit a plan for what she hoped to have accomplished in her first 30 days at Andela.  In the plan she submitted, Ms. Machi explained that **within 30 days** she expected to "[h]ave provided **basic insight into how Toptal does things for folks around the company**."

190.    At one point, Ms. Machi stated she "was working with almost everyone from the [Andela] business especially those in leadership positions … Happy to provide whatever intel [concerning Toptal] I can when it makes sense."

191.    Ms. Machi was tasked by Andela with making Andela a copycat clone of Toptal, and in particular, with making the "Andela experience" match the Toptal experience and shared Toptal documentation with executives at Andela.

192.    In June 2020, Ms. Machi gave a presentation to Andela to executives and others about Toptal's portal.

193.    At various points, Ms. Machi revealed non-public, confidential information to Andela concerning the Toptal remote experience, metrics for churn rates, resume editing, "roll off," referral fee structures, and other unique features of Toptal.  Ms. Machi also provided Andela with Toptal contracts, including one she alleged found by exploiting what she characterized as a "hole" known to her in Toptal's internet security.

194.    Andela's Slack communications reveal Ms. Machi making herself a resource to anyone at Andela needing Toptal inside intelligence, stating for example, "just reiterating my

48

willingness to be involved in the OKR/visibility/standardization project we discussed today. ***FWIW I helped Taso design the OKR system at Toptal so have spent a lot of time on the topic."***

195.    Slack messages from others at Andela also reveal how they used her for Toptal information, stating variously "Courtney shared that they do this at Toptal," "Becker was checking with Courtney to get intel on toptal approach which might inform what we do," and "Courtney and I were brainstorming … and she was outlining that …. was a major source of new talent at TopTal."

196.    Additionally, Andela has repeatedly used Ms. Machi to solicit her former colleagues to leave Toptal and join Andela, often in violation of their contractual obligations to Toptal.

197.    On August 25, 2020, a Toptal core team member gave notice of her resignation to Toptal.  She informed Toptal that Ms. Machi was offering her a job at Andela.  When Ms. Machi was contacted directly by Toptal, she did not dispute that she had solicited this Toptal core team member to come work for Andela.  Despite Ms. Machi's breach of her obligations not to solicit this individual, Toptal was able to retain the person (albeit at a higher compensation level).

198.    Ms. Machi used her relationships with Toptal Personnel and Talent, that she brought with her from Toptal, for Andela's competitive purposes.

199.    Ms. Machi is known to have participated in the solicitation of former Toptal Personnel at Andela, Ms. Goss, Ms. Della Corte, Mr. Zanella, and Ms. Peters, and has actively provided "intelligence" to her Andela colleagues about other key Toptal Personnel to solicit for particular roles at Andela.

200.    Ms. Machi, as an Andela team leader, also fostered a culture for Former Toptal Personnel at Andela to openly flout and brazenly violate their confidentiality obligations to Toptal and share Toptal trade secrets and confidential information.

49

201.     Since Ms. Machi's departure, multiple key Toptal Personnel have departed Toptal – all of whom initially lied to or misled Toptal about their plans.

202.     On July 31, 2020, Ms. Goss resigned from Toptal purportedly to work as a recruiter at Intelligent Staffing, a staffing company that does not provide the same type of freelancers as Toptal.

203.     Instead, Ms. Goss's LinkedIn profile stated that she became "Team Lead – Senior Technical Recruiter" at Andela – a position in which she could have easily exploited her prior relationships with Toptal's Talent pool and knowledge of Toptal's Talent recruitment processes (having served on its Talent Acquisition Team), and she may have used trade secrets or confidential information that she brought with her from Toptal for Andela's competitive purposes.

204.     In fact, Toptal learned that Ms. Machi told Andela to solicit Ms. Goss as a tech recruiter.

205.     In internal communications amongst Andela human resources personnel, Andela discussed that Ms. Goss, Ms. McCoy, and Ms. Sadovic, who worked together as a team of tech recruiters at Toptal, should be solicited and work together at Andela in similar roles.

206.     Through her work at Andela, Ms. Goss directly violated the non-compete provision of her employment agreement with Toptal.

207.     On November 6, 2020, Ms. McCoy resigned from Toptal, telling Toptal's Director of People that she was going to join a "small" start-up and to build a recruiting team.

208.     On November 6, 2020, Toptal emailed Ms. McCoy a letter reminding her of her confidentiality and non-solicitation obligations and providing her with a copy of her employment agreement.

50

INDEX NO. 653677/2021

RECEIVED NYSCEF: 05/23/2024

209.     Contradicting her statements to Toptal about joining a small start-up, Ms. McCoy's LinkedIn profile stated that beginning November 2020, she held the position of "Manager, Engineer Recruiting" at Andela.  This position appears to be similar to or the same as her prior positions at Toptal, where she acted on its Talent Acquisition Team.

210.     Ms. McCoy was placed by Andela in a position in which she could readily exploit her prior relationships with Toptal's Talent pool and knowledge of Toptal's Talent recruitment processes, and she used trade secrets or confidential information that she brought with her from Toptal for Andela's competitive purposes.

211.     Through her work at Andela, Ms. McCoy directly violated the non-compete provision of her employment agreement with Toptal.

212.     In December 2020, Ms. Sadovic left Toptal.  Shortly thereafter, Ms. Sadovic's LinkedIn profile claimed that she had recently started her own firm providing talent acquisition services, Sadovic & Co., but Toptal believes that this is merely an entity under which she operated and her chief, if not only, client was Andela.

213.     As it turned out, Ms. Sadovic had in fact entered a consulting agreement with Andela on November 30, 2020, and began providing services on January 12, 2021. She was working with her former Toptal colleagues, Ms. Goss and Ms. McCoy in leveraging their knowledge of the Toptal Talent vetting process from their time on the Talent Acquisition Team at Toptal to assist Andela's competitive purposes.

214.     On December 17, 2020, Mr. Zanella gave notice that he was resigning from his position with Toptal effective January 6, 2021.  In an exit interview, he stated that he wanted to do more data science work and did not feel the business analyst role he was then in at Toptal was a fit.

51

215.    On January 6, 2021, Toptal emailed Mr. Zanella a letter reminding him of his confidentiality and non-solicitation obligations and providing him with a copy of his written agreement.

216.    Mr. Zanella's LinkedIn profile stated that beginning January 2021, he actually held the position of "Senior Data Analyst" at Andela.  He was in a position in which he could readily exploit his know-how of Toptal's business function, platforms and processes, and he used trade secrets or confidential information that he brought with him from Toptal for Andela's competitive purposes.

217.    In fact, Mr. Zanella was recruited to work at Andela through a combined recruitment effort by Ms. Machi, Ms. Goss, and Mr. Hennessy (whose own improper recruitment is described below).

218.    Through his work at Andela, Mr. Zanella directly violated the non-compete provision of his agreement with Toptal.

c.    **Andela Caused Mr. Bhagwata to Violate His Obligations by Soliciting Toptal Personnel and Soliciting His Client Contacts from Toptal for Andela**

219.    In June 2020, Mr. Beneschott, Toptal's former Chief Operating Officer, introduced Mr. Bhagwata to Andela, identifying him as an individual to recruit because he was a sales leader at Toptal.

220.    On August 18, 2020, Mr. Bhagwata resigned from Toptal and stated in an exit interview that he had not made any decisions about his next place of employment.  Mr. Bhagwata was asked to execute a termination certificate (as required by his employment agreement) to certify that he had complied with his agreement, would maintain the confidentiality of Toptal's trade secrets and confidential information, and that he would not solicit Toptal's employees for a period of 12 months.  It also required him to disclose any new position he had accepted.

221.    A copy of the termination certificate that was an exhibit to his agreement was sent to Mr. Bhagwata on August 17, 2020, but he failed to sign and return it to Toptal – which indicated that he was not complying with his contractual obligations.

222.    On August 18, 2020, Toptal emailed Mr. Bhagwata a letter reminding him of his confidentiality and non-solicitation obligations, providing him with a copy of his employment agreement.

223.    On September 9, 2020 (shortly after Mr. Bhagwata claimed he had no plans for the future), Andela issued a press release, entitled "Andela Hires Sachin Bhagwata as Vice President of Enterprise." Shortly thereafter, Mr. Bhagwata was listed on Andela's website as a member of Andela's leadership team with that same title.

224.    This position is similar to or the same positions as those Mr. Bhagwata held at Toptal, where he acted as Client Partner and Interim Head of Enterprise.

225.    Mr. Bhagwata appears to have leveraged the network of contacts he developed while at Toptal, calling on the same people and using the same format to generate new business for Andela. Toptal believes that Mr. Bhagwata used other trade secrets or confidential information that he brought with him from Toptal for Andela's competitive purposes.

226.    As set forth above, Mr. Johnson had communicated with Mr. Bhagwata by text message that it would be safer to use WhatsApp messaging on personal devices rather when discussing Toptal rather than Andela email accounts since such personal communications (Mr. Johnson wrongly asserted) would not be discovered in connection with future litigation by Toptal, which Mr. Johnson clearly anticipated in view of the wholesale misappropriation he was orchestrating and leading as Andela's CEO.

53

227.    On or about March 19, 2021, Toptal's contact at a large Toptal enterprise client stated to multiple current Toptal Personnel that Mr. Bhagwata has repeatedly reached out directly to him asking him to send business to Andela.

228.    Furthermore, it appears Mr. Bhagwata is marketing Andela's business to his old contact list from his time at Toptal, using the same format that Toptal uses.

229.    On March 11, 2021, Mr. Bhagwata sent what appears to be a mass email from his new work email address at Andela, sachin.bhagwata@andela.com, including to sachin@toptal.com, his old work email address at Toptal.  The email was entitled "VIP Wine Tasting with Andela: Your Package Arrives Soon," and the greetings said, "Hi Sachin."  It is evident that this email was not some typographical mistake, but that Mr. Bhagwata was mass-emailing his old contact lists.  His only apparent mistake was failing to realize that his own Toptal email address was among his exported contact list and Mr. Bhagwata's consequent failure to remove it before emailing his former Toptal clients on behalf of his new employer, Andela—all in brazen violation of his contractual obligations to Toptal.

230.    This email is significant both because it shows Mr. Bhagwata contacting his old contacts from Toptal, and because it shows him utilizing the same business development and sales methods that clients of Toptal were accustomed to seeing from Mr. Bhagwata while he was representing Toptal.  Toptal uses (and had used during Mr. Bhagwata's tenure at Toptal) identical VIP wine tastings for marketing and client development purposes to gain client goodwill, and Mr. Bhagwata clearly tried exploiting the relationships he developed with the very same contacts at the very same Toptal clients while working at Toptal for Andela's competitive advantage.

54

231.    Discovery has confirmed that Mr. Bhagwata actually used his Toptal experience as a basis to solicit multiple Toptal enterprise clients, including Anthem, AXA, Unilever and Walmart for Andela.

232.    Mr. Bhagwata was also involved in the solicitation of Toptal Personnel to come work at Andela, and was directed by Andela executives to do so.

233.    On August 4, 2020, Mr. Hennessey resigned from Toptal, telling Toptal's Chief Product Officer and Director of People that he did not have a job lined up and that he planned to "hang out" in Chicago on his uncle's boat and take some time off.

234.    Instead, Mr. Hennessey's LinkedIn profile stated that beginning in September 2020, he held the position of "Senior Director – Enterprise Strategy" at Andela.  This position appears to be virtually the same as his prior positions at Toptal as Director of Enterprise Performance and Director of Enterprise Analytics, and he is or may be using trade secrets or confidential information that he brought with him from Toptal for Andela's competitive purposes.

235.    However, Toptal has learned that Mr. Bhagwata not only brought Mr. Hennessey over to work at Andela as part of a "package" (*i.e.*, a group from Toptal that would join Andela together), but even outlined his job description there.

236.    Mr. Bhagwata referred Mr. Chikilian and Ms. Ristic to come work for Andela to assist in recruiting Toptal Talent and possibly Toptal Personnel.

237.    Mr. Bhagwata also solicited Mr. Henn to come work for Andela, but in an admission of guilt and a desire to make his violation more difficult for Toptal to ever detect, he told Andela's CEO, Mr. Johnson, that "I clearly don't want to be involved directly."

238.    Additionally, Mr. Bhagwata, Ms. Machi, Mr. Chikilian and Mr. Bacinger regularly discussed plans to poach Toptal Talent and Personnel.

55

### d.  Andela Caused Mr. Oliveira to Use His New Role at Andela to Leverage His Toptal Knowledge

239.    Mr. Oliveira's LinkedIn profile states that he has worked from April 2019 to April 2021 as Product Principal at Mechanism Ventures.

240.    In addition, his LinkedIn profile states that *during the same period*, he acted as an independent business owner "[w]orking as a consultant for various clients in the capacity of Business Operations and Technical consulting …. Also working as an advisory on the Freelancing space."

241.    Upon information and belief, Mr. Oliveira's principal client for his consulting services during this period was Andela, but he did not publicize it to avoid detection by Toptal because he was breaching his agreement by working for Andela.

242.    During the spring of 2020, Mr. Oliveira was just one of the former Toptal Personnel that had provided detailed information to Andela's CEO concerning the inner workings of Toptal and who referred multiple former Toptal Personnel to Mr. Johnson to interview and hire.

243.    Ms. Machi confirmed to Toptal in a conversation during the summer of 2020 that Mr. Oliveira was by then doing work for Andela behind the scenes.

244.    Upon information and belief, Mr. Oliveira's work during this period directly violated his non-solicitation covenant and confidentiality clause in his agreement with Toptal.

245.    Upon information and belief, during the period Mr. Oliveira acted as an "independent business owner," he recruited and/or colluded with his former subordinates at Toptal, such as Mr. Chikilian, and the other individuals described above, to once again work together and reassemble their Talent Ops team from Toptal but for the benefit of Andela, where they would be compensated to share the know-how and relationships they had acquired and developed at Toptal.

56

246. Mr. Oliveira's LinkedIn profile states that beginning in April 2021, Mr. Oliveira acted as "EVP of Talent Operations" at Andela. Upon information and belief, in this capacity, Mr. Oliveira is leveraging his intimate knowledge of Toptal's Talent, processes and tools for the commercial advantage of Andela and has worked with his former team at Toptal, including Mr. Chikilian, Mr. Zanella, Ms. Peters (who became a Vice President at Andela), Ms. Goss, and Ms. McCoy.

247. Mr. Oliveira participated in soliciting key Toptal Personnel to Andela, including Mr. Bacinger (who went on to solicit countless Toptal Talent on Andela's behalf) and Ms. Peters.

### e. Andela's Use of the Former Toptal Personnel at Andela to Misappropriate Toptal Trade Secrets and Confidential Information

248. Although the full extent of Andela's improper solicitation campaign cannot be known until after the completion of discovery, it is clear from the facts Toptal has gathered so far that Andela is using Former Toptal Personnel to misappropriate Toptal trade secrets and other confidential information on a systematic and deliberately calculated basis.

249. Various of the Former Toptal Personnel at Andela, and other former Toptal Personnel, such as Messrs. Beneschott and Kearns, actually aided Andela in misappropriating Toptal trade secrets and other confidential information to Andela's competitive advantage, including *without limitation* by sharing the information in oral interviews with Andela (from which the Toptal Info Compendium was compiled). Some Former Toptal Personnel at Andela responded to inquiries in Slack messaging by Andela stakeholders working to solve particular challenges, or making presentations concerning Toptal's products and platform.

250. Andela knew that the Former Toptal Personnel at Andela were prohibited by their contractual, fiduciary, and ethical duties from providing such information to Andela, let alone assisting Andela in exploiting the information for a competitive advantage. In fact, some Former

Toptal Personnel at Andela executed agreements with Andela containing an "Exhibit A-1" (otherwise known at Andela as the "Toptal clause"), explicitly acknowledging post-engagement restrictive covenants with Toptal.

251. While Toptal does not know the full extent to which Andela has actually misappropriated Toptal trade secrets or confidential information, let alone how Andela integrated and made use of such information in its own processes, it is evident that Andela at the very least misappropriated the following information through former Toptal Personnel (following the categories Andela itself highlighted in the Toptal Info Compendium):

1. <u>Bench:</u>
   a. Toptal's analysis of whether to use a paid "bench" model for talents not on active assignment.
2. <u>Billing/Finance:</u>
   a. Policies concerning billing clients and paying talent to secure positive cashflow.
   b. Use of various payment solutions for paying talent and others globally.
3. <u>Community:</u>
   a. The "Community" offering for talent, including how it is structured, the type of content it contains, community/norms and enforcement in the channels, and describing the role of the person(s) whose responsibility it is to maintain the community.
   b. Providing topics of discussion to the community.
   c. Community events.
4. <u>Employment Matters:</u>
   a. Remote work philosophy and structure.
   b. Use of background checks on international team members or talent.
5. <u>Legal:</u>
   a. Policies/procedures for hiring from various countries.
   b. Standard talent agreements.
6. <u>Matching:</u>
   a. Procedures for "expectation setting" for talent and client.
   b. Procedures for sending various talents options and rates to clients.
   c. Policies for determining how to prioritize assignment of talents as between enterprise and small and medium business (SMB) customers.
   d. Procedures and systems for checking in on talent engagements.
   e. Use of talent and client metrics.
   f. Procedures for handling engagements that did not go well.
   g. Facilitating client payments of bonuses or raises to talent.
   h. Resources for interview preparation for talent.

      i. Information provided to talent concerning specific client's interview processes.

      j. Statistics concerning job launches.

      k. Procedures concerning "roll off" and "estimated end date" of engagements.

      l. Average duration of engagements for small and medium business ("SMB") v. Enterprise clients.

7. Pricing:

      a. Pricing policy and markup for SMB v. Enterprise.

8. Product/Platform/Tech:

      a. Structure of product team and relationship with stakeholders.

      b. Description/explanation of how the Toptal internal platform integrated with data warehouse.

      c. How Toptal ensured data in the candidate pipeline bore correct timestamps.

      d. Toptal's reluctance to go through with certain project proposals.

      e. Signup wizard.

      f. TopScheduler.

      g. Talent's ability to toggle availability.

      h. Toptal entity relationship diagram (ERD) language.

      i. OKR (objectives and key metrics) system.

      j. Metrics of "time to first interview," "time to match," "claimed job conversion rate" and "churn".

      k. Research/comparison to other companies based on such metrics.

      l. "Job record" data model and types of information collected.

      m. Design of search and filtering options.

      n. System for tracking incentives for referrals by talent, clients and team members.

9. Profiles:

      a. Profile editing and review process.

      b. Content required for talent profiles.

10. Offerings:

      a. "Toptal Projects" offering.

      b. Offering of cloud services to enterprise resource planning (ERP) software.

11. Sales/Marketing:

      a. Different pricing tiers.

      b. Two week trial periods.

      c. Commission structures for sales representatives.

      d. Customer deposit requirements.

      e. Decisions about use of titles for marketing/describing particular talent.

      f. Use of inbound v. outbound model for sales.

      g. Roles and deployment of Toptal sales teams, including inbound sales reps, account managers and relationship managers.

      h. Sales strategies/tips for selling to Enterprise clients.

12. Sourcing/Recruiting:

    a.  Referral commission structure.

    b.  Incentives for talent referrals and any stackable incentives.

    c.  Providing information and links to talent so that they can obtain referrals.

    d.  Use of LinkedIn InMail and LinkedIn analytics/statistics.

    e.  Use of talent in certain stacks to recruit others in such stacks.

    f.  Non-cash incentives for referral.

    g.  Obtaining lead lists for talent.

    h.  Use of SEO campaigns to find talent.

13.  <u>Talent Relations:</u>

    a.  Policy/procedure for returning or destroying data from talent that was on Toptal platform.

    b.  Bring your own device (BYOD) infrastructure.

    c.  Policies and support to provide hardware to talent.

    d.  Policies for talent rate changes.

    e.  Process for talent to change their rates.

    f.  Managing rate changes.

    g.  Policies concerning pay gap between US and non-US talent.

    h.  Process for identity management.

14.  <u>Vetting/Screening:</u>

    a.  Incentives for various stakeholders in the talent vetting pipeline.

    b.  The vetting process/funnel.

    c.  Quizzes and tests given to applicants.

    d.  The four steps in the screening process and how each are performed.

    e.  Policies for expediting talent in high demand stacks.

    f.  Actual statistics for approved talent.

    g.  Providing notice to rejected candidates who did not pass vetting.

252. The information described in this section, together with the Toptal's strategies and processes for recruiting Talent, including its vetting processes, the identities of Toptal's vetted Talent and clients (including the client contacts), as well any other Toptal-owned information that has been misappropriated by Andela (which Toptal may learn of through discovery or other investigation), is referred to hereinafter as the "Toptal Trade Secrets" and/or "Toptal Confidential Information."

253. The Toptal Trade Secrets are essential to Toptal's business model, which is predicated on the ability to source, match, and timely deliver Talent from all over the world to

Case 1:24-cv-04027-JHR-JW     Document 1-5     Filed 05/24/24     Page 62 of 77

customers in need of such Talent, and give Toptal a competitive advantage on the market because they are not widely known.

254.    The Toptal Trade Secrets were developed by Toptal through substantial effort and kept in confidence, and the information is not otherwise readily ascertainable.

255.    The Toptal Trade Secrets were protected from disclosure through reasonable measures, including:

    a.    Requiring Toptal Personnel to execute confidentiality agreements;

    b.    Maintaining employee and independent contractor handbooks with ethics rules prohibiting their misuse;

    c.    Allowing access to certain such written information or documents to Toptal Personnel on a "need to know" basis only;

    d.    Requiring the storage of such information only on Toptal's network;

    e.    Making the information accessible to Toptal Personnel only through password-protected means; and

    f.    Periodically reminding Toptal Personnel of such confidentiality obligations and the requirement to return any proprietary materials to Toptal, including at the conclusion of their engagements.

256.    In one stark example of Andela's use of the Former Toptal Personnel at Andela to misappropriate the Toptal Trade Secrets, it appears that Andela tasked Mr. Bacinger, its "Head of Assessment," with creating a framework for "assessing" (*i.e.*, screening or vetting) talent to be admitted to Andela's talent network.

257.    Mr. Bacinger made proposals for how to change Andela's screening process to mirror Toptal's processes exactly, down to the timing expectations to onboard Talent and how

long the screening process takes, and recommended removing everything from Andela's screening process that would be considered different from Toptal.

258.   Mr. Bacinger also proposed an identical approach to fill out the screening team using the talent network and compensation plans as Toptal.

259.   In a separate presentation prepared by or with the assistance of Mr. Bacinger discussing how Andela planned to build out its talent operations and supplies, there are organizational charts that were so strikingly similar to Toptal's that former Toptalers had difficulty telling them apart, revealing the extent to which Andela was replicating the structure and operations of Toptal's Talent Operations function.

260.   That presentation included detailed non-public and confidential, proprietary information and metrics from Toptal's screening process and operations.

261.   The brazen extent to which Andela was copying and ripping off  Toptal's Trade Secrets and Confidential Informationin a wholesale manner, down to the details, is simply shocking.  For example, Andela blatantly copied and pasted Toptal scripts in generating responses to online test assessments that Andela was developing.  The Andela scripts were identical to those of Toptal, even down to using *Toptal's* name.  Thus, the Andela Talent Roadmap indicated that rejected applicants of *Andela* would get an automated response *from Andela* that used *Toptal's* name: "We're sorry you had a bad experience with *our* screening process. *Toptal* gets thousands of applications each week …"

262.   These are but a few illustrations of where Andela used information gleaned from the Former Toptal Personnel at Andela to build its own talent assessment processes and talent network, even down to appropriating Toptal's responses to questions regarding the online test without bothering to do so much as even changing Toptal's name.

## V.    Toptal's Demand Letters to Mr. Bhagwata, Ms. Machi, and Andela

263.    After Mr. Bhagwata twice failed to respond to Toptal's requests to execute a Termination Certification, Toptal's outside counsel sent a letter to Mr. Bhagwata on September 18, 2020, reminding him of his various confidentiality and post-employment obligations under his Agreement with Toptal, as well as his failure to provide a termination certification as required by his agreement with Toptal.   The letter further demanded that Mr. Bhagwata not violate his confidentiality obligations to Toptal in his new employment as Andela's VP of Enterprise, and specifically asked him "(1) to provide written assurances to that effect and that make clear that you will not be employed by Andela in a manner that causes you to violate your Agreement with Toptal, and (2) to return your signed Termination Certificate -- in both cases by September 30, 2020."

264.    On September 18, 2020, Toptal, through its outside counsel, sent a letter to Ms. Machi reminding her of her various confidentiality and non-solicitation obligations under her agreement with Toptal.   The letter to Ms. Machi advised her that **"**Toptal has reason to believe that you recently attempted to solicit at least one former Toptal colleague in violation of this obligation."   The letter further requested that she "provide written assurances that you will not be employed by Andela in a manner that causes you to violate your Agreement with Toptal by September 30, 2020."

265.    On September 18, 2020, Toptal, through its outside counsel, sent a letter to Andela apprising it of the specific confidentiality and non-solicitation provisions in Mr. Bhagwata's and Ms. Machi's agreements with Toptal and demanding that "Andela provide written assurances by September 30, 2020 that it will not employ either of Mr. Bhagwata and Ms. Machi in a manner that causes or induces them to violate the terms of the[ir] respective Agreement[s] with Toptal …"

63

266.    Neither Toptal nor its outside counsel received any responses to its letters from Mr. Bhagwata, Ms. Machi, or Andela by September 30, 2020, or ever.

267.    Toptal still has not received a termination certificate from Mr. Bhagwata, who may have been advised by Andela not to execute it in connection with his departure from Toptal to Andela, knowing full well that he was being called on to violate his confidentiality and non-solicitation obligations.

268.    Notwithstanding Toptal's outside counsel's letter to Andela, it – through the Former Toptal Personnel at Andela – has audaciously continued its campaign of poaching key Toptal Personnel to build Andela's copycat enterprise, as set forth above.

## VI.    Andela's Engagement of Toptal's Part-Time Consultant

269.    In addition to poaching key Toptal Personnel, Andela has taken to emulating Toptal's success by utilizing Toptal's part-time consultant, Jon Younger, Ph.D., to generate media attention for itself.  On his LinkedIn profile, Mr. Younger gave the following description of his expertise: "HR thought-leader, author, advisor, board member, and early stage investor in HR tech startups. Current emphasis: Agile talent, the freelance revolution and the future of work."

270.    Pursuant to an advisor agreement with Toptal dated November 22, 2016, Mr. Younger was engaged as "a part-time advisor to the Company, working up to 15% of the time." That agreement has not been terminated.

271.    Pursuant to Mr. Younger's contract, he has held a public-facing role by producing a number of articles for Toptal's website with titles such as "How Agile Talent Can Transform Your Growth Mindset" and "Managing Remote Freelancers? These Principles Will Help."

272.    Nonetheless, as part of Andela's public relations and search engine optimization (SEO) strategy and broader efforts to freeride on Toptal's success, Andela and Mr. Bhagwata

64

brazenly used Mr. Younger to place articles and interviews – including with Mr. Bhagwata – to get positive media attention for Andela. The message is clear: why reinvent any wheel that Toptal had invented when Andela and Mr. Bhagwata could just tap Mr. Younger to do precisely for Andela what they knew Mr. Younger was under contract to do for Toptal?

273.    In an April 24, 2021 article on Forbes.com entitled "Andela: An African Freelance Leader Going Global," Mr. Younger described his conversations with "Jeremy Johnson and Sachin Bhagwata, the CEO and EVP Enterprise of Andela respectively, one of the largest and best-known African tech professional freelance platforms."

274.    Mr. Younger also interviewed Mr. Bhagwata as part of a March 29, 2021 article on Forbes.com entitled "How Are You Rewarding Your Best Freelancers."

275.    Mr. Chikilian, utilizing his LinkedIn profile to promote Andela's work, reposted a link to Mr. Younger's "Global Survey on Freelancing" and commended Mr. Younger for his work.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ANDELA
### (Tortious Interference with Contract)

276.    Toptal repeats, realleges and incorporates by reference all allegations set forth above as if fully set forth at length herein.

277.    Andela had actual knowledge that each of the Former Toptal Personnel at Andela was previously employed or engaged by Toptal and was subject to confidentiality and non-solicitation obligations to Toptal. Many of the Former Toptal Personnel at Andela actually have specific provisions in their agreements with Andela noting that they were under prior contractual obligations to Toptal.

278.    In the case of Mr. Bhagwata and Ms. Machi, Andela was specifically advised in writing by Toptal and Toptal's outside counsel of their contractual obligations, to which Andela did not respond. In that written communication, Toptal's outside counsel further apprised Andela

that each Toptal employee and contractor had substantially similar provisions in their individual agreements with Toptal.

279.     All Former Toptal Personnel at Andela are parties to their respective agreements with Toptal, by which they agreed not to, directly or indirectly, through themselves or through an affiliate or on behalf of any third party, improperly use or divulge Toptal's trade secrets or confidential information.

280.     Mr. Chikilian, Ms. Machi, and Mr. Bhagwata each further agreed for a period of time following the conclusion of their engagements with Toptal (6 months, 12 months and 12 months, respectively) not to solicit employees of Toptal and, in the cases of Mr. Chikilian and Ms. Machi, not to solicit clients, contractors or consultants of Toptal.

281.     Ms. Goss, Ms. McCoy, and Mr. Zanella further have non-compete provisions in their agreements that prohibit them from employment at, or otherwise providing services to, direct competitors, like Andela, for a period of 12 months after leaving Toptal.

282.     The remaining Former Toptal Personnel at Andela were also subject to similar confidentiality, non-compete, and non-solicitation provisions.

283.     Andela induced, solicited, or otherwise caused the Former Toptal Personnel at Andela to breach their obligations to Toptal under their respective agreements, by using their access to and knowledge about the Toptal Trade Secrets, Toptal Confidential Information, and identities of and access to Toptal Talent and other Toptal Personnel to solicit or misappropriate the same for Andela's own competitive purposes.

284.     Andela induced, solicited, or otherwise caused various Former Toptal Personnel at Andela to breach their non-solicitation obligations to Toptal under their respective agreements, by soliciting for employment of engagement other Toptal Personnel or Toptal customers.

285.     Andela also induced, solicited, or otherwise caused Ms. Goss, Ms. McCoy, and Mr. Zanella and likely other Former Toptal Personnel at Andela to violate their 12 month non-compete provisions by immediately coming to work for Andela after departing from Toptal.

286.     Andela's conduct was intentional, improper, unjustified and the proximate cause of the breaches by the Former Toptal Personnel who joined Andela.

287.     As a result of Andela's action, Toptal has already suffered and continues to suffer substantial economic damages and is entitled to recover against Andela in an amount that is presently unknown and will be determined at trial, but is in excess of the jurisdictional threshold of this Court.

288.     Andela's conduct evinces a high degree of malice and moral turpitude and demonstrates such wanton dishonesty and fraudulent action as to imply a criminal indifference to civil obligations, warranting an award of punitive damages against Andela.

289.     Toptal continues to suffer damages as a result of the continuing knowing and willful misconduct of Andela which, if not enjoined, shall cause irreparable, unquantifiable damages to Toptal, and Toptal is entitled to permanent injunctive relief in addition to any remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Misappropriation of Trade Secrets)

290.     Toptal repeats, realleges and incorporates by reference all allegations set forth above as if fully set forth at length herein.

291.     The Toptal Trade Secrets constitute protected trade secrets because (a) they derive independent economic value from not being generally known or easily ascertainable by proper means by persons outside of Toptal and Toptal's trusted Toptal Personnel, and give Toptal an economic advantage over competitors in the marketplace who do not have access to Toptal's information and know-how, and cannot be easily replicated by others without improper means or

67

by investing the substantial efforts and expense that Toptal has made, and (b) Toptal employs reasonable and extensive measures and expends significant sums to protect and guard such trade secrets and confidential information and prevent their dissemination to Toptal's competitors and others outside of Toptal.

292.    The Former Toptal Personnel who joined Andela, by virtue of their respective agreements with Toptal and positions of trust and authority on behalf of Toptal, were provided access to the Toptal Trade Secrets for Toptal's purposes only, and were prohibited from using such Toptal Trade Secrets for any other purposes, including for the purposes of any future employers, like Andela, who directly compete with Toptal.

293.    The Former Toptal Personnel at Andela improperly used and disclosed the Toptal Trade Secrets to and for the benefit of Andela, and to Toptal's detriment.

294.    Andela intentionally solicited and obtained the Toptal Trade Secrets from the Former Toptal Personnel at Andela and other former Toptal Personnel (including Messrs. Beneschott, Kearns and Boyette) for Andela's competitive use.

295.    Andela knows, or has reason to know, that the Former Toptal Personnel who joined Andela, acting as Andela's employees, agents or independent contractors, used the Toptal Trade Secrets in violation of their agreements and positions of trust and authority, have misappropriated the Toptal Trade Secrets for Andela's competitive use, and in fact solicited other Toptal Personnel and Talent to work for Andela.

296.    Defendants not only used the Toptal Trade Secrets to compete with and injure Toptal, but did so in an unfair, willful and malicious manner, the object and purpose of which was to despoil Toptal's business, goodwill, trade and patronage with its clients, Toptal Personnel and

Talent, and promote Andela's competitive business to the detriment of Toptal, for Andela's own profit.

297.     As a result of Defendants' actions, Toptal has already suffered and continues to suffer substantial economic damages and is entitled to recover against Defendants in an amount that is presently unknown and will be determined at trial, but is in excess of the jurisdictional threshold of this Court.

298.     Defendants' conduct evinces a high degree of malice and moral turpitude and demonstrates such wanton dishonesty and fraudulent action as to imply a criminal indifference to civil obligations, warranting an award of punitive damages against Defendants.

299.     Toptal continues to suffer damages as a result of the continuing conduct by Defendants which, if not enjoined, shall cause irreparable, unquantifiable damages to Toptal, and Toptal is entitled to permanent injunctive relief in addition to any remedy at law.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Unfair Competition)

300.     Toptal repeats, realleges and incorporates by reference all allegations set forth above as if fully set forth at length herein.

301.     The information identified as the Toptal Confidential Information constitutes confidential and proprietary information, for which Toptal employs reasonable and extensive measures and expends significant sums to protect and guard, and to prevent their dissemination to Toptal's competitors.

302.     The Former Toptal Personnel who joined Andela, by virtue of their respective agreements with Toptal and positions of trust and authority on behalf of Toptal, were provided access to the Toptal Confidential Information for Toptal's purposes only, and were prohibited

69

indefinitely from using Toptal Confidential Information for any other purposes, including for the purposes of any prospective employers, like Andela, who directly compete with Toptal.

303.     The Former Toptal Personnel who joined Andela, improperly used and disclosed the Toptal Confidential Information, in a manner that is unfair and improper, to and for the benefit of Andela, and to Toptal's detriment.

304.     Andela intentionally solicited and obtained the Toptal Confidential Information from the Former Toptal Personnel at Andela and other former Toptal Personnel (including Messrs. Beneschott, Kearns and Boyette) for Andela's competitive use.

305.     Andela knows, or has reason to know, that the Former Toptal Personnel who joined Andela, acting as Andela's employees, or independent contractors, have used the Toptal Confidential Information in violation of their agreements and positions of trust and authority for Toptal, have misappropriated the Toptal Confidential Information for Andela's competitive use, and have in fact solicited other Toptal Personnel and Talent to work for Andela.

306.     Defendants not only used the Toptal Confidential Information to compete with and injure Toptal, but do so in an unfair, willful and malicious manner, the object and purpose of which is to despoil Toptal's business, goodwill, trade and patronage with its clients, Toptal Personnel and Talent, and promote Andela's competitive business to the detriment of Toptal, for Andela's own profit.

307.     As a result of Defendants' actions, Toptal has already suffered and continues to suffer substantial economic damages and is entitled to recover against Defendants in an amount that is presently unknown and will be determined at trial, but is in excess of the jurisdictional threshold of this Court.

70

308.     Defendants' conduct evinces a high degree of malice moral turpitude and demonstrates such wanton dishonesty and fraudulent behavior as to imply a criminal indifference to civil obligations, warranting an award of punitive damages against Defendants.

309.     Toptal continues to suffer damages as a result of the continuing conduct by Defendants which, if not enjoined, shall cause irreparable, unquantifiable damages to Toptal, and Toptal is entitled to permanent injunctive relief in addition to any remedy at law.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Violation of the DTSA)

310.     Toptal repeats, realleges and incorporates by reference all allegations set forth above as if fully set forth at length herein.

311.     The Toptal Trade Secrets meet the standard for a protectible trade secret under 18 U.S.C. § 1839(3) because (a) they involve formulas, patterns, devices, or compilations of information which are used in Toptal's business, and which give Toptal opportunities to obtain an advantage over competitors who do not know or use the Toptal Trade Secrets, (b) Toptal, as the owner of the Toptal Trade Secrets, has taken reasonable measures to keep such information secret, and (c) the Toptal Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

312.     Andela misappropriated the Toptal Trade Secrets by acquiring them through improper means—obtaining them from the Former Toptal Personnel at Andela and other former Toptal Personell (such as Messrs. Beneschott, Kearns and Boyette) who were obligated by their contractual obligations to Toptal not to disclose or disseminate such information—and using them for Andela's benefit.

71

313.     Andela knew or had reason to know that the Toptal Trade Secrets were acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, or derived from or through persons who owed such a duty.

314.     Ms. Machi misappropriated the Toptal Trade Secrets by disclosing and using them for the benefit of Andela without Toptal's consent, despite here contractual, fiduciary and ethical duty to maintain the secrecy of the trade secrets.

315.     Defendants not only used the Toptal Trade Secrets to compete with and injure Toptal, but did so in an unfair, willful and malicious manner, the object and purpose of which was to despoil Toptal's business, goodwill, trade and patronage with its clients, Toptal Personnel and Talent, and promote Andela's competitive business to the detriment of Toptal, for Andela's own profit.

316.     As a result of Defendants' actions, Toptal has already suffered and continues to suffer substantial economic damages and is entitled to recover against Defendants in an amount that is presently unknown and will be determined at trial, but is in excess of the jurisdictional threshold of this Court.

317.     Defendants' conduct evinces a high degree of malice and moral turpitude and demonstrates such wanton dishonesty and fraudulent behavior as to imply a criminal indifference to civil obligations, warranting an award of punitive damages against Defendants.

318.     Toptal continues to suffer damages as a result of the continuing conduct by Defendants which, if not enjoined, shall cause irreparable, unquantifiable damages to Toptal, and Toptal is entitled to permanent injunctive relief in addition to any remedy at law.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT MACHI
### (Breach of Contract)

319.     Toptal repeats, realleges and incorporates by reference all allegations set forth above as if fully set forth at length herein.

320.     Defendant Machi is a party to an employment agreement with Toptal, by which she was prohibited (including after termination of her employment) from directly or indirectly, through herself or through an affiliate or on behalf of any third party, using or divulging Toptal's trade secrets or confidential information, for any other purposes, including for the purposes of any prospective employers, like Andela, who directly compete with Toptal. Defendant Machi was further prohibited, for a period of 12 months following the termination of her employment with Toptal, from soliciting any of the Toptal Personnel, Talent, or clients.

321.     Toptal has performed its obligations to Defendant Machi under her employment agreement.

322.     Defendant Machi has breached her employment agreement with Toptal by soliciting Toptal Personnel to come work for Andela during the restrictive period following her employment at Toptal. She is also improperly using and disclosing Toptal's trade secrets and confidential information (including concerning the structure of Toptal's platform and recruitment and matching processes), in a manner that is unfair and improper, to and for the benefit of Andela, and to Toptal's detriment.

323.     As a result of Defendant Machi's actions, Toptal has already suffered and continues to suffer substantial economic damages and is entitled to recover against her in an amount that is presently unknown and will be determined at trial, but is in excess of the jurisdictional threshold of this Court.

Case 1:24-cv-04027-JHR-JW    Document 1-5    Filed 05/24/24    Page 75 of 77

324.    Defendant Machi's conduct evinces a high degree of malice and moral turpitude and demonstrates such wanton dishonesty and fraudulent behavior as to imply a criminal indifference to civil obligations, warranting an award of punitive damages against Defendant Machi.

325.    Toptal continues to suffer damages as a result of the continuing conduct by Defendant Machi which, if not enjoined, shall cause irreparable, unquantifiable damages to Toptal, and Toptal is entitled to permanent injunctive relief in addition to any remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Toptal demands a trial by jury and that a Judgment be entered in favor of Toptal and against all Defendants, jointly and severally, as follows:

a.  Compensatory and consequential damages in an amount to be determined at trial that is presently unknown, but is in excess of the jurisdictional threshold of this Court;

b.  Punitive damages in an amount to be determined at trial;

c.  A permanent injunction enjoining each of the Defendants, and their agents, employees or anyone acting on its behalf, from directly or indirectly, by themselves or to assist any third party, from causing any Toptal Personnel or Former Toptal Personnel at Andela, from breaching their confidentiality or non-solicitation obligations to Toptal, including without limitation disclosing Toptal's trade secrets or confidential information or soliciting Toptal Personnel, Talent or clients;

d.  Attorneys' fees, costs and disbursements herein; *and*

e.  All such other and further relief as this Court deems to be just and equitable.

Dated: May 23, 2024

Respectfully submitted,

CARTER LEDYARD & MILBURN LLP

By:  __/s/ Jacob H. Nemon_____
      Jacob H. Nemon
28 Liberty Street, 41st Floor
New York, New York 10005
Tel. (212) 732-3200
Fax (212) 732-3232
Email nemon@clm.com

LATHAM & WATKINS LLP
      Kevin M. McDonough
1271 Avenue of the Americas
New York, New York 10020
Tel. (212) 906-1200
Fax (212) 751-4864
Email kevin.mcdonough@lw.com

*Attorneys for Plaintiff Toptal, LLC*

75

INDEX NO. 653677/2021
RECEIVED NYSCEF: 05/23/2024

**VERIFICATION**

STATE OF NEW YORK            )
                             ) ss:
COUNTY OF NEW YORK           )

　　　　TASO DU VAL, hereby deposes and says that the following is true and correct, under the

penalty of perjury:  I am over the age of 18, I am the Chief Executive Officer of Plaintiff Toptal

LLC.  I have read the foregoing Verified First Amended Complaint, and know the contents thereof

and the same is true to my knowledge, except as to the matters therein stated to be alleged upon

information and belief, and that as to those matters, I believe them to be true.

                                                                TASO DU VAL

Sworn to before me this
23 day of May, 2024

Notary Public

DI CONG JIANG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01JI0004030
Qualified in Queens County
Commission Expires 03/27/2027

76